[Cite as *State v. Smith*, 2023-Ohio-603.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 111274 |
| GARRY F. SMITH, | : | |
| Defendant-Appellant. | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART; REMANDED
**RELEASED AND JOURNALIZED:** March 2, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-20-651674-A and CR-20-655568-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Lisa J. Turoso, Assistant Prosecuting Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Noelle A. Powell, Assistant Public Defender, *for appellant.*

EILEEN A. GALLAGHER, P.J.:

{¶ 1} Defendant-appellant Garry Smith ("Smith") appeals his convictions for domestic violence in Cuyahoga C.P. No. CR-20-651674-A ("651674") and his convictions for felonious assault and domestic violence in Cuyahoga C.P. CR-20-

655568-A ("655568") following a bench trial. Smith contends that the trial court erred by admitting evidence of out-of-court statements made by the alleged victim, who did not testify at trial, in violation of his rights under the Sixth Amendment's Confrontation Clause and the rules of evidence. Smith also contends that (1) his guilty verdicts are against the manifest weight of the evidence, (2) he was denied a right to trial by jury because, due to COVID-related delays, he was forced to choose between "continued confinement in the county jail" and "his right to a jury of his peers" and (3) the trial court erred in sentencing him to an indefinite sentence in 655568 because the indefinite sentencing provisions of the Reagan Tokes Law are unconstitutional.

{¶ 2} For the reasons that follow, we (1) reverse the trial court's decision and vacate Smith's convictions in 651674 and (2) affirm the trial court's decision in 655568.

## I. Factual Background and Procedural History

{¶ 3} In 651674, a Cuyahoga County Grand Jury indicted Smith on two counts of domestic violence in violation of R.C. 2919.25(A), a fourth-degree felony. Count 1 included a pregnant victim specification; both counts included a furthermore clause, alleging that Smith had previously pleaded guilty to or had been convicted of domestic violence in November 2012. The charges related to Smith's alleged assault of Barbara Bradley on March 21, 2020.

{¶ 4} Following the March 21, 2020 incident, Smith was arrested and released on bond. One of the conditions of his bond was that he was to have no

contact with Bradley. Smith was arraigned on November 24, 2020, and his bond was continued with the condition that he have no contact with Bradley. Smith pled not guilty to all charges.

{¶ 5} In 655568, a Cuyahoga County Grand Jury indicted Smith on three counts: one count of felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony (Count 1); one count of felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony (Count 2) and one count of domestic violence in violation of R.C. 2919.25(A), a fourth-degree felony (Count 3). The felonious assault counts included one- and three-year firearm specifications. The domestic violence count included a one-year firearm specification and a furthermore clause, alleging that Smith had previously pleaded guilty to or been convicted of domestic violence in November 2012. The charges related to Smith's alleged assault of Bradley on December 26, 2020. Smith was arrested on December 26, 2020 for that alleged assault and released on bond two days later. Smith pled not guilty to all charges.

### A. Motions in Limine and Other Pretrial Proceedings

{¶ 6} Following Smith's indictment in 655568, the state filed a motion to revoke his bond in 651674. In its motion, the state asserted that Smith had admitted to having been in contact with Bradley, although he denied injuring her. A hearing was set on the motion. Smith failed to appear for the hearing. Smith's bond was revoked and a capias was issued. A few days later, Smith was again arrested, and a holder was placed on him due to the new charges in 655568. On February 18, 2021,

Smith filed a motion to reinstate bond and remove holder in both cases. The trial court denied the motion. On March 11, 2021, Smith filed a motion to set and/or reinstate bond in both cases. The trial court denied the motion. On April 16, 2021, Smith filed a motion to be released from detention and to be placed in an ankle bracelet in both cases. The motion was denied. On August 17, 2021, Smith filed a motion to dismiss for failure to provide a speedy trial in both cases.

{¶ 7} On September 24, 2021, Smith filed a combined motion in limine in both cases, seeking to preclude the state from introducing evidence of (among other things) out-of-court statements by Bradley captured on police body camera recordings "without having the victim actually testify in court" on the grounds that it would violate the Confrontation Clause and the rules of evidence. Smith also sought to preclude the introduction of "any and all 'dispatcher calls'" due to "the unavailability to counsel[,] * * * the hearsay content of these calls and the inability to cross[-]examine the speaker of the calls." On September 27, 2021, Smith filed a second motion in limine in both cases, seeking to preclude the introduction of "[a]ny and all portions of the victim's medical records that contain the HISTORY of the alleged offense(s)." Smith argued that the admission of such medical records, "without having the victim testifying in court," would "constitute hearsay and would totally prevent cross[-]examination of the victim" in violation of his rights and this

court's decision in *State v. Simmons*, 8th Dist. Cuyahoga No. 98613, 2013-Ohio-1789.[1]

{¶ 8} In response, the state asserted that it had subpoenaed Bradley to testify in these cases and indicated that "[i]f the victim appears, the [s]tate will question her about these things." However, the state further asserted that if Bradley did not appear for trial, evidence of her statements would nevertheless be admissible "pursuant to the primary purpose test" because "[t]he officers were at the house to meet an ongoing emergency." With respect the "history" reflected in Bradley's medical records, the state asserted that "[t]hese statements have long been deemed admissible pursuant to Ohio Evid.R. 803(4)."

{¶ 9} On November 30, 2021, the state filed a motion for joinder of the two cases. Smith opposed the motion and filed a motion for separate trials.

---

[1] In *Simmons*, the trial court, over the defendant's objection, allowed a sexual assault nurse examiner who had treated the rape victim to read a "narrative" she had asked the victim to provide that described the rape "in [the victim's] own words" into evidence at trial. *Id*. at ¶ 23-24. On appeal, this court stated that although the information the victim provided "concerning [her] physical injuries and how she was raped" was "necessary for proper medical treatment and diagnosis," it could "find little evidence to suggest that [the victim's] narrative aided in any sort of diagnosis or medical treatment" and found that "the details provided by [the victim] in the narrative, such as how she met [the defendant], [the defendant's] statements and demeanor during the rape, and [the victim's] actions following the rape, were not for the purpose of medical treatment, but rather related primarily to the investigation of [the defendant]." *Id*. at ¶ 25. As such, the court determined that the narrative did not fall within the hearsay exception set forth in Evid.R. 803(4) and that the trial court had erred in admitting evidence of the narrative. *Id*. at ¶ 26. In that case, however, the victim "took the stand" at trial, "provided substantial testimony regarding the events of the night, including the information provided in the narrative" and defense counsel "conducted a substantial cross-examination" of the victim. Under those circumstances, the court held that the defendant's rights under the Confrontation Clause were not violated and that the trial court's error in admitting evidence of the narrative was harmless beyond a reasonable doubt. *Id*. at ¶ 26-29.

{¶ 10} On December 1, 2021, Smith waived his right to a jury trial. The trial court granted the state's motion for joinder, denied Smith's motion for separate trials and the cases proceeded to a bench trial.

{¶ 11} Before trial commenced, the trial court allowed the parties to present oral argument on Smith's motions in limine. Smith reiterated the arguments set forth in his motions, i.e., that the statements at issue were elicited "for investigative purposes" and that admission of body camera footage and other evidence of the absent witness' statements would violate his right of confrontation and the rules of evidence. Defense counsel further explained his concerns as follows:

> I've had cases where they hide the victim, they tell them, [w]e don't need you if you don't come down, when in fact they're available and want to come down, Judge. I don't know what's going on here. I mean, I have the right of cross-examination. * * * [S]ome other people that did that to me and I'm sensitive to that.

{¶ 12} The trial judge acknowledged defense counsel's concerns and indicated that she did not believe that was happening in this case:

> Well, I think you have the assurance of the prosecutors representing the State of Ohio that that is not the case. They have subpoenaed the victim, they are anticipating her presence.

{¶ 13} The state asserted that although it "intend[ed] to call the victim," Bradley had not appeared to testify.[2] The state argued that regardless of the

---

[2] During its argument on the motions in limine, the state suggested that Smith may have had an active role in Bradley's failure to appear to testify. The state claimed that hundreds of calls had been made to various telephone numbers associated with Bradley using Smith's pin while he was in jail awaiting trial. No evidence was presented regarding these alleged calls or the content of these alleged calls, and the state did not file a motion for forfeiture for wrongdoing. Accordingly, we do not further consider the issue here.

appearance of Bradley, her statements were admissible under numerous hearsay exceptions as statements "made for medical diagnosis and treatment," statements "describ[ing] her physical condition" and statements made "under the stress and excitement of the event." With respect to Smith's Confrontation Clause concerns, the state asserted that admission of evidence of Bradley's statements related to the March 21, 2020 incident would not violate the Confrontation Clause because "[t]hey were taken in the back of an ambulance," "the victim [was] describing her injuries" and Smith had "shortly left" and officers were "concerned about his whereabouts." The state further asserted that evidence of Bradley's statements related to the December 26, 2020 incident "would be offer[ed] under the primary purpose test of an ongoing emergency" and that those statements, made while Bradley was "all bloodied," after Smith had left with a weapon and officers were "concerned about finding him," "were clearly not testimonial statements."

{¶ 14} After listening to the parties' arguments, the trial court stated:

I have to consider whether * * * [t]he primary purpose of a conversation captured on body camera is made for the purpose of an out-of-court substitution of trial testimony or if it's made during an ongoing investigation. I haven't seen or heard the body camera. * * * The law allows for evidence-based prosecution in domestic violence cases where the victim is unavailable.

{¶ 15} After further consideration, the trial court denied Smith's motions in limine. Citing *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and *State v. Tomlinson*, 8th Dist. Cuyahoga No. 109614, 2021-Ohio-1301, the trial court stated that "[t]o determine whether a statement is testimonial

or nontestimonial, we have to consider whether a reasonable person in the declarant's position would anticipate that his or her statement is being used against the accused in investigating and prosecuting the case." The trial court indicated that *Tomlinson* was "similar to the facts presented by counsel with regard to the evidence at issue here" and that, therefore, "the body camera or 911 calls or the evidence the State seeks to present is nontestimonial in nature." The trial court further stated that it would determine the admissibility of the evidence, i.e., whether the statements "fall within a firmly rooted hearsay exception" such as the excited-utterance exception, "at such time as the evidence is presented."[3] The trial court also denied Smith's motion to dismiss for failure to provide a speedy trial.

**B. Trial**

{¶ 16} Bradley did not appear to testify at trial.[4]

{¶ 17} The state presented testimony from six witnesses at trial: Cleveland police officers Brandon Melbar ("Melbar"), Jared Germaine ("Germaine"), Colbert Stadden ("Stadden") and Brian Soucek ("Soucek"); 911 "call-taker"/dispatcher

---

[3] It is not clear from the record whether the trial court reviewed the body camera footage or other evidence of Bradley's statements prior to determining that Bradley's statements were nontestimonial and denying Smith's motions in limine. When the parties argued the motions, the trial court stated that "it [hadn't] seen or heard the body camera," but it is not clear if the trial court reviewed the body camera footage or any other evidence during a recess, prior to ruling on the motions in limine.

[4] The record reflects that Bradley was served with a subpoena for the December 2021 trial. However, there is nothing in the record to indicate that a bench warrant was requested or issued to secure Bradley's appearance as a material witness at trial when she failed to appear in response to the subpoena. The state confirmed, during its appellate oral argument, that a bench warrant had not been requested or issued for Bradley.

Jessica McDougler ("McDougler"); and Cleveland police detective William Cunningham ("Cunningham"). In addition to the witness testimony, the state introduced photographs of Bradley's injuries (state exhibit Nos. 3-7 and 9), the audio recording of Bradley's 911 call relating to the December 26, 2020 incident (state exhibit No. 8), excerpts of footage from the body cameras of Melbar and Soucek (state exhibit Nos. 2 and 12) and a certified copy of a docket listing that included a journal entry reflecting Smith's prior conviction for domestic violence on November 26, 2012 in Cleveland M.C. No. 2012-CRB-37229 (state exhibit No. 11). The parties also stipulated to the admission of Bradley's medical records from MetroHealth Medical Center dated March 21, 2020 related to the incident (state exhibit No. 10).

{¶ 18} Smith testified in his defense and also presented testimony from his nephew, Chance Smith ("Chance"). A summary of the relevant evidence follows.

### 1. Evidence Presented by the State Relating to the March 21, 2020 Incident

{¶ 19} Soucek and Cunningham testified for the state regarding the March 21, 2020 incident.

{¶ 20} Soucek testified that on the evening of March 21, 2020, he and his partner, Officer Piper ("Piper"), responded to a call regarding "a female assaulted" that had occurred on Connecticut Avenue in Cleveland. He stated that the incident had occurred "on the street somewhere." Soucek did not know exactly when the incident occurred but stated that the victim, later identified as Bradley, was "already

being escorted into the EMS wagon" when they arrived. Soucek indicated that he had been wearing, and had activated, his body camera that evening. Over Smith's objection, the state introduced footage from Soucek's body camera (state exhibit No. 12), which recorded the officers' interrogation of Bradley while she was in the back of the ambulance. The state played excerpts[5] of the body camera footage (video and audio recordings), which Soucek acknowledged was a "fair and accurate depiction of what [he] saw that night," for the trial court. Rather than having Soucek testify based on his own recollection of the events, the state asked Soucek to describe what he observed on the body camera footage and, at times, to repeat what Bradley had said as heard on the body camera footage while the trial court viewed the body camera footage:

> Q. I'm stopping at 2:03. What did we just hear on the body cam the victim say?
>
>> [Defense Counsel]: Objection. Let it speak for itself.
>>
>> THE COURT: Overruled.
>
> A. She stated that her fiancé assaulted her and also ripped her hair.
>
> Q. Specifically, what else? That's all right, I'll just hit Play. Now, I'm stopping at 3 minutes 4 seconds, and just prior to this you could see something with the victim. Can you describe what you see?

{¶ 21} Soucek testified that, as seen in the body camera footage, the right side of Bradley's face was "very swollen," her "eye was swollen shut," "little spots of blood

---

[5] Although state exhibit No. 2 contains approximately eight-and-one-half minutes of body camera footage, the record reflects that state played only six minutes and 42 seconds of that footage during Soucek's testimony.

and glue" were visible where her hair had been ripped out and she appeared "very disheveled" with ger shirt "ripped, dirty" like she "was in a fight."

{¶ 22} The body camera footage captured the following colloquy as the officers interviewed Bradley while she was in the back of the ambulance being treated by EMS:

Q. So what happened?

A. My fiancé beat me up 'cuz I had an argument with his niece. Me and his niece had an argument. This is what he did. He pulled my hair up on the roots.

Q. Do you live with him?

A. We do live together.

Q. Who's this? Was this your niece here? She said you're five months pregnant? Does that sound about right? Did you take any kicks or punches or anything to the stomach?

A. To my knee, to my chest, to my stomach. I no longer feel my baby moving.

Q. Where did this happen at?

A. Outside.

Q. Outside where? In front of this house here?

A. * * * We were down the street.

Q. * * * Do you live over here?

A. No. We were on our way to her house but it didn't happen in her house.

Q. But it happened down the street here?

A.    We had an argument and, you know, we were all, we were drinking. I'm not even supposed to be drinking.

Q.    So, it happened in the car?

A.    Outside the car.

Q.    So, is he still in the area, or did he drive away?

A.    No. He drove away. He left.

{¶ 23} In response to further police inquiries, Bradley provided officers with her name and date of birth, Smith's name and date of birth and their address in East Cleveland. EMS personnel observed that Bradley's heart was "beating real fast" and placed a heart monitor on Bradley. When asked by EMS personnel whether she had taken any drugs, Bradley stated: "I snorted cocaine when he beat me up. I snorted a couple rounds of cocaine." Bradley further indicated that she was pregnant with her sixth child and that Smith was the baby's father. As officers continued to question Bradley, she provided additional details regarding the incident:

Q.    Can you tell me exactly what he did at the car?

A.    He punched me in my face and other people were trying to break it up and he pushed everybody away. He threatened to shoot me and said he would kill me. He was also intoxicated. Very intoxicated.

Q.    And he ripped out your hair?

A.    He ripped out my hair. This is what he did to me. He kneed me to the face, the chest, stomach. * * *

{¶ 24} Soucek testified that when the officers arrived on scene, Bradley's "aunt" was present, i.e., that Bradley had gone to her aunt's house to call for help

and that her "aunt called it in."[6]  Soucek stated that his partner, Piper, interviewed Bradley's aunt but that the aunt did not witness the incident.

{¶ 25} EMS transported Bradley to the hospital; the officers followed Bradley to the hospital.  At the hospital, officers further questioned Bradley and a supervisor took photographs of her injuries for the police report.  Soucek identified the photographs of Bradley's injuries (state exhibit No. 9) and confirmed that they fairly and accurately depicted Bradley's injuries as he had observed them the night of the incident.

{¶ 26} Soucek testified that although Bradley made no mention of a weapon when the officers were questioning her while she was in the ambulance. However, at the hospital, "[w]hile she was receiving treatment," Bradley told him that Smith had a gun on him that day and that he had assaulted her previous times but was "unsure if they were reported."  The officers' interrogation of Bradley at the hospital was not captured on the body camera footage admitted into evidence at trial.

{¶ 27} Cunningham was the detective assigned to investigate the March 21, 2020 incident.  He testified that, in investigating the March 21, 2020 incident, he reviewed the police report, researched Smith's criminal history, reviewed

---

[6] The body camera footage contradicts this testimony slightly.  The body camera footage reflects that police responded to the home of Bradley's niece and that it was Bradley's niece who called 911.  At the end of the body camera footage (state exhibit No. 12), an unidentified person, presumably Bradley's niece, states: "She just got here about 20 minutes ago, and, when she got here, the first thing I did was call EMS because that's my aunt.  I don't know who she was with.  She stay all the way in East Cleveland but whoever she was with had to be on this side of town and dumped her off, and she knocked on my door."

photographs of Bradley's injuries and obtained a search warrant to obtain Bradley's medical records relating to the incident. Cunningham identified the photographs, medical records and a journal entry reflecting Smith's prior conviction for domestic violence on November 26, 2012.

{¶ 28} Bradley's medical records include an "emergency department – visit note," dated March 21, 2020, which states, in relevant part, as follows:

> The history is provided by the Patient.
> [Bradley] is a 38 year old female with a history of drug use per chart review presenting to the ED as a Cat 2 trauma after an assault.[EM.1] Pt states that her boyfriend was drunk and showing off, so hit and knocked her in the face and stomach. Denied LOC or AC. Had been drinking tonight herself. Says that she took some cocaine for the pain after. This is her 6th pregnancy. Is not feeling the baby move anymore — did before. No vaginal leakage or leakage for fluids. Thinks she is 5 months. Was lightheaded earlier, not currently. Has diffuse arm and abdominal pain. Also c[JV.1]omplaining [sic] of facial pain in the trauma bay.[EM.1]       Denies      tingling/numbness/weakness      anywhere, incontinence, IVDA[BG.1][.]

{¶ 29} The medical records also include a "Consult Note," which states, in relevant part:

> HPI: [KB.1] [Bradley] [KB.2] is a[KB.1] 38 year old[KB.2] G[KB.1]6[KB.3]P4105[KB.1] at [KB.3] 22w3d[KB.4] gestation[KB.3] who presents[KB.1] to the ED s/p assault by FOB/fiancé. Patient reports that they were both intoxicated (alcohol + cocaine). After a short verbal altercation, he punched her in the face multiple times, pulled her hair out, then kneed/kicked her in her chest and abdomen. Patient reports facial and abdominal pain. She denies and contractions. * * * Active fetal movement prior to altercation. Currently not feeling any in the ED.

{¶ 30} Cunningham testified that he had attempted to speak with Bradley to "find out her side" regarding the incident but was unable to do so. He indicated that, at that time, the department had "a standard" of attempting to contact a victim three

times and "after that, then we have to take the facts to the prosecutor of what we have." He stated that, in his experience, it is "not uncommon" for victims of domestic violence "to not want to speak with law enforcement."[7]

### 2. Evidence Presented by the State Relating to the December 26, 2020 Incident

{¶ 31} Melbar, Germaine, Stadden, McDougler and Cunningham testified for the state regarding the December 26, 2020 incident.

{¶ 32} McDougler was working as a 911 "call-taker" on December 26, 2020, when she received a call from Bradley  The state played an audio recording of the 911 call for the trial court (state exhibit No. 8), which McDougler confirmed was a fair and accurate recording of the 911 call she received from Bradley

{¶ 33} At the outset of the 911 call, Bradley told McDougler that she needed police at her home, gave her name and address and said, "He left. He's leaving. * * * He's leaving in the truck." McDougler asked, "What's going on?" Bradley replied: "He beat me. He beat me bad. He beat me with a gun." In response to further inquiries, Bradley identified her assailant as Smith and provided his date of birth and a description of the vehicle in which he had left. Bradley stated that she did not know in which direction Smith went when he left. Bradley denied that she needed an ambulance and stated, "I think I'll be ok, but I do need them * * * to help me get my face together. Ok? I am beat real bad." When asked where the gun was, Bradley

---

[7] Although Bradley had told the officers that others had witnessed the March 21, 2020 incident and had tried to break up the fight, there is no evidence that Cunningham or any of the other officers attempted to locate or interview any of those witnesses.

stated: "He might have got rid of it because he left.  He left.  He left.  He left."
McDougler indicated that they would "get someone out there" and ended the call.

{¶ 34} Melbar testified that at approximately 5:15 a.m. on December 26, 2020, he and his partner, Germaine, responded to a domestic violence call for "a female assaulted" at a residence on Parkhill Avenue in Cleveland.  When the officers arrived at the residence, they knocked on the door and a female, later identified as Bradley, opened the door.  Bradley was the only person in the residence at that time.  Melbar stated that Bradley was bleeding, had "a large laceration to her head" and "severe swelling" that was "really bad."  Germaine stated that when Bradley came to the door, "[s]he had a very serious-looking head trauma with a lot of blood."

{¶ 35} Melbar and Germaine entered the residence and began to speak with Bradley Germaine described Bradley as "distraught and a little bit out of it."  Melbar described Bradley as "afraid," "really nervous," "shaking" and "crying."  Melbar stated that, initially, "[s]he didn't really want to talk to us that much" but that, as she calmed down, Bradley told the officers what had happened.

{¶ 36} Melbar testified that Bradley told the officers she and her "husband," Smith, had gotten into an argument because one of his friends, "Shoulders,"[8] had disrespected her and Smith "didn't stick up for her."  When the friend left, Smith "became aggressive," pulled out a firearm and cocked it.  Melbar stated that Bradley

---

[8] In the trial transcript, this friend is referred to both as "Shoulders" and "Shoulder."  For consistency, we refer to this individual as "Shoulders" throughout.

told him she had asked Smith whether he was going to shoot her and that Smith said, "No," and he then pistol-whipped her multiple times.

{¶ 37} Germaine testified that Bradley told the officers that she had been in a physical altercation with Smith "over [an] incident that occurred prior with his daughter and another male that was on the scene [who was] disrespectful" and that, during the altercation, Smith had struck her twice in the head with a gun.

{¶ 38} The officers were aware of the prior incident involving Bradley's daughter. Melbar testified that sometime earlier that day, he and Germaine had responded to a call at the residence regarding a dispute between Bradley and her sister. Germaine testified that when the officers arrived at the residence, Bradley's daughter was outside. Melbar stated that the officers spoke with Bradley's daughter and that she informed them that there had been an altercation among family members in which she had been pushed by her stepfather. When the officers approached the home, Smith and Bradley answered the door and identified themselves but did not allow the officers inside the home.

{¶ 39} Melbar testified that at the time of the first "call-out," Smith, Bradley, Bradley's daughter and three or four other people were at the residence. Melbar stated that Bradley later told the officers that Smith had "supposedly shoved" Bradley's daughter while attempting to break up the fight. Germaine testified that it was his understanding that Bradley's daughter had gotten "in between the argument" between Bradley and her sister and that Smith had "pushed [Bradley's daughter] out of the way so that he could separate the parties." Melbar testified that

he had gotten "a good look" at Bradley during the first call-out and that she did not appear to be injured. Germaine likewise testified that he saw no visible injuries on Bradley at the time of the first call-out. Germaine identified Smith in court as the man who had answered the door on that first call-out.

{¶ 40} Melbar testified that Bradley told the officers that, after the second incident, Smith had left the house in a burgundy 2006 Ford Expedition with temporary tags. Melbar stated that he broadcast the vehicle description to other patrol officers so they could attempt to locate Smith. Germaine testified that the officers also requested that EMS respond because they wanted to get Bradley "to a safe location, to the hospital to get checked out, and make sure that she was all right." Melbar testified that it was "[p]robably the worst DV [he had] ever seen" and that "it was clear that she definitely needed medical attention." EMS later responded to the scene.

{¶ 41} Melbar and Germaine stated that they did not locate a firearm at the residence and believed that Smith may have taken the firearm with him when he left. Melbar indicated that he felt it was important to locate Smith because Bradley "didn't want to go with the ambulance" and he feared she would be "in danger" if Smith returned.

{¶ 42} During Melbar's direct examination, after he provided a brief overview of what had occurred, the state introduced footage from Melbar's body

camera (state exhibit No. 2),[9] which recorded the officers' actions and observations at the scene, including their interview of Bradley, during the second call-out. The state then played excerpts[10] of the body camera footage (video and audio recordings) for the trial court.[11]

{¶ 43} As captured in the body camera footage, Bradley told the officers, in response to their inquiries, that she had been upset with Smith following the earlier altercation in which Smith had pushed Bradley's 14-year-old daughter. She said that she told Smith: "Don't put your hands on my daughter. You're a whole grown man. She's a little girl. She's 14 years old. Do not hit her like that." Later in the interview, Bradley told police that she did not believe Smith had intended to hurt her daughter and that she "would have been at [her] daughter's side if he did anything to [her] daughter."

{¶ 44} Bradley stated that, prior to the second incident, she had also been upset because Smith's friend, Shoulders, had been "coming at [her] disrespectfully," "going up in my face, talking crazy, telling about what he's going to do to me" and

_____

[9] Although Melbar testified that he was wearing his body camera, no body camera footage was introduced into evidence from the first call-out on December 26, 2020.

[10] State exhibit No. 2 contains approximately 50 minutes of body camera footage. According to the state, it played "probably three or four minutes" of that footage during Melbar's testimony.

[11] Before the state played the body camera footage, the trial court noted Smith's "ongoing objection to the presentation of this evidence" as set forth in his motions in limine. The trial court overruled Smith's objection based on "the same explanation already given," i.e., that the evidence was "nontestimonial in nature and admissible under the hearsay exception."

Smith had done nothing in response. She indicated that after Shoulders left, an argument ensued between her and Smith. Bradley told the officers that she asked Smith why he let Shoulders "disrespect" her. She stated that Smith responded, "F*** you, b****. I don't give a f*** about you," and grabbed his gun, a black handgun. Bradley stated that she asked Smith whether he was going to shoot her and that he replied, "No, b****." Bradley said that Smith cocked the gun, but did not shoot her. She indicated that Smith then "slapped" her "twice" with the gun. She told police that she believed Smith had pistol-whipped her because "I was talking about s*** that was going on * * * things that was going on earlier today and he didn't like what I was saying."

{¶ 45} Bradley told police that after Smith pistol-whipped Bradley, he left in her vehicle.[12] Bradley stated that she did not know whether Smith had taken the gun with him when he left but that she knew it was not in the house. She indicated that "he might have gotten rid of it."

{¶ 46} When officers asked Bradley whether Smith had "ever attacked her like this in the past," Bradley responded that they had a prior domestic violence case but that it "wasn't as serious." Bradley acknowledged that, this time, it was "pretty bad."

{¶ 47} Bradley told the officers that she did not want to go to the hospital because Smith had the only set of keys to the house and she could not lock up the

---

[12] Bradley indicated that she had paid for the vehicle but that Smith had registered the vehicle in his name.

house and get back in. She indicated that she did not want to give a written statement and did not want Smith to go to jail.

{¶ 48} Melbar testified that Bradley's face was "extremely bad" and that the body camera footage, which was "a little bit dark," did not fully capture her injuries. He stated that Bradley was bleeding with "severe swelling." During their testimony, the officers identified several photographs of Bradley's injuries that were taken by a supervisor (state exhibit Nos. 3-7). Melbar also pointed out blood splatter on the walls and the television, which he said could be seen in the body camera footage.

{¶ 49} Melbar testified that the officers eventually convinced Bradley to go to the hospital and drove her to the hospital, where she received stitches for the laceration on her head.

{¶ 50} Stadden testified that he and his partner had assisted in searching for the suspect, the victim's "live-in boyfriend," in connection with a report of "a female beaten with a gun, pistol-whipped," on December 26, 2020. He stated that officers had been given the suspect's name, Smith, along with his date of birth, social security number and a description of the vehicle in which Smith had fled the crime scene — a 2006 burgundy Ford Explorer — and had been told that Smith was "possibly armed." Based on the information provided, additional information, including a VIN and temporary tag number, were obtained for the vehicle. Stadden stated that he and his partner observed the vehicle as it turned from Kinsman Road. onto Martin Luther King Boulevard and conducted a traffic stop.

{¶ 51} Stadden testified that, as he approached the driver's side of the vehicle, he told the driver to show his hands because "of the seriousness of the crime" and because he "wasn't sure if he had a weapon on him." Stadden stated that the driver complied, identified himself as Smith and, at Stadden's request, stepped out of the vehicle. After patting Smith down, officers placed Smith in the back seat of their zone car, "Mirandized him" and took him to the Cuyahoga County Jail. Stadden stated that Smith asked, "What's going on? What's this about?" when they stopped him and told police that he was on his way back home. Stadden identified Smith in court as the man they had arrested. Melbar and Germaine were still with Bradley at her home when officers stopped and detained Smith.

{¶ 52} Stadden testified that Smith did not resist arrest, that he did not find any weapons on Smith and that he did not observe any blood on Smith's hands or clothes. After arresting Smith, officers inventoried the vehicle; no weapons or ammunition was discovered in the inventory search.

{¶ 53} Cunningham was the detective assigned to investigate the December 26, 2020 incident. He testified that he spoke with Bradley on December 26 or 27, 2020 by telephone for approximately eight to eight-and-one-half minutes and recorded the call on his body camera.[13] He stated that, at that time, Bradley was "a little relaxed," "kind of still upset, but not frantic or anything," and that she was able to provide "a clear story of what had happened." Cunningham indicated that

_____

[13] No body camera footage from this interview was introduced at trial.

he took the information Bradley had given him and "presented the facts" along with the police report and photographs of Bradley's injuries to the prosecutor.

{¶ 54} On cross-examination, Cunningham testified that Bradley had told him Smith had "assaulted her by punching her" once on December 26, 2020 and made "[n]o mention of a gun." On redirect examination, however, he stated that due to the "severity of the laceration" as depicted in the photographs of Bradley's injuries, he believed her injuries were caused by "more than a punch."

### 3. Testimony of Defense Witnesses

{¶ 55} Chance, Smith's nephew, testified that Bradley dated his uncle and that the couple had been together for "many years." He stated that on December 25-26, 2020, he had been at Bradley and Smith's home from sometime in the afternoon until 1:00 or 2:00 a.m. He indicated that when he was at the house, Smith, Bradley, Bradley's sister and her boyfriend, Bradley's niece, two of Bradley's sons and Bradley's daughter were also there. He stated that everyone was having "a good time," "partying, listening to music" and that all the adults, including both Smith and Bradley, were drinking alcohol.

{¶ 56} Chance testified that, at some point that evening, Bradley and her sister began arguing and "were trying to fist fight in the kitchen." He stated that they "got close enough to each other that nobody did too much damage" but that the argument ended with "cooking grease all over the floor," so that everyone was "slipping and falling." Chance indicated that when the fight started, Smith was sleeping on the couch. Chance stated that Smith "woke up from the commotion"

and "did what everybody else did * * * try to stop the argument." Eventually the two women were separated, and Bradley's sister left.

{¶ 57} Chance testified that after her sister left, Bradley was still "yelling and belligerent" and got into an argument with her son and daughter. Chance indicated that by the time he left the home, only Smith, Bradley and Bradley's daughter remained. He stated that, at that time, Bradley was drunk and "mad" due to the argument with her sister, but "looked fine" and did not have any marks on her.

{¶ 58} Chance testified that he did not hear Smith and Bradley arguing that evening, did not see Smith punch or strike Bradley that evening and had never seen Smith with a gun. Chance testified that he had not seen Smith since that night and that he did not know what happened after he left.

{¶ 59} Smith testified that he and Bradley had been together since 2002 and that "[w]e say were married because we been together so long." He stated that the couple had eight children in total and that their youngest child had just turned one. He indicated that on the night of December 25, 2020, various family and friends were at their home to celebrate Christmas.

{¶ 60} Smith testified that, at some point that he evening, he woke up to "a whole lot of noise" and "a whole lot of debris" as Bradley and her sister were in the dining room fighting. He stated that, while fighting, the two women knocked over food and cooking grease, broke the fish tank and "tore the house up." Smith indicated that he "got in the middle of it trying to break 'em up."

{¶ 61} Smith stated that, after the fight, he told everyone to get out of the home and that "when everybody started to get their stuff to leave," he left too. He indicated that, at that time, Bradley had no injuries to her face.

{¶ 62} Smith testified that after he left, he and his friend Shoulders went down to "the projects" and that he then got "pulled over" and arrested. He stated that after he "bonded out" two days later, he came home and observed that Bradley had "a little scratch on her head." He indicated that he asked Bradley how she got the scratch but that Bradley said that it was "nothing but a little scratch," "a superficial scratch." Smith stated that he did not know how Bradley got the scratch on her head.

{¶ 63} Smith testified that Bradley calls the police on him "when she['s] mad" because she assumes he is cheating on her and that "she always get mad when me and [Shoulders] go somewhere together, because she think I'm cheating on her every time I go out the door: "That's all she say every time she drink, 'You're going out to cheat.'" Smith claimed that he knew nothing about Bradley's December 26, 2020 injuries until trial when he saw the photographs of the injuries. Smith denied that he struck Bradley at any time and denied that he had a gun.

{¶ 64} Smith also denied that he had caused Bradley's injuries on March 21, 2020. Smith testified that, on March 21, 2020, he and Bradley went to a friend's house on Warner Road. He stated that Bradley got into a fight with a girl with whom Bradley had accused Smith of cheating, resulting in a swollen eye. He testified that Bradley had told him, "I'm gonna do everything I can every time you cheat on me,

I'm gonna make you miserable." Smith denied striking Bradley and stated that when he left, Bradley was "fine" and "[e]verybody was down in the basement getting drunk." Smith testified that Bradley called him the following day and asked him to bring her home from the hospital and that he did so.

{¶ 65} Smith admitted that he had been talking to Bradley while he was in jail and stated that all of their calls had been recorded. He indicated that he had never admitted injuring Bradley and that Bradley had never said to him, "You did this to me." He claimed that he had asked Bradley to come to court and testify but that Bradley told him she was not coming to court because "I already told you[,] you ain't did nothing."

{¶ 66} Following the presentation of the evidence, Smith moved for acquittal, pursuant to Crim.R. 29. After hearing argument, the trial court denied the motion.

### D. Verdicts

{¶ 67} On December 3, 2021, the trial court found Smith guilty on all counts, in both cases, as charged. The trial court referred Smith for a presentence investigation and report and scheduled a sentencing hearing for the following month.

### E. Sentencing

{¶ 68} On January 19, 2022, the trial court conducted a sentencing hearing. Although Bradley did not testify at trial, she sent a text message to be read at

sentencing, requesting leniency, which the victim advocate read into the record. The trial court also heard from the state, defense counsel and Smith.

{¶ 69} In 655568, the trial court found that the three counts were allied offenses of similar import that merged for sentencing. The state elected to have Smith sentenced on Count 2. The trial court ordered that the sentences on the one- and three-year firearm specifications be served concurrently and that the three-year sentence on the firearm specifications be served prior to and consecutive to an indefinite sentence (under the Reagan Tokes Law) of six to nine years on the underlying offense, resulting in an aggregate sentence of nine to 12 years. The trial court also imposed mandatory postrelease control of 18 months to three years. Smith objected to the constitutionality of the Reagan Tokes Law's indefinite sentencing provisions.

{¶ 70} In 651674, the trial court sentenced Smith to 12 months on each count, to be served concurrently to one another but consecutively to the sentence in 655568.

{¶ 71} Smith appealed, raising the following five assignments of error for review:

> ASSIGNMENT OF ERROR I: Mr. Smith's right to confront his accuser, under the Sixth and Fourteenth Amendments of the United States Constitution and Article I, Section 10 of the Ohio Constitution, was violated when the trial court admitted testimonial statements made by the accuser, who did not testify, via police body camera recordings.
>
> ASSIGNMENT OF ERROR II: The statements in the March 2020 body camera recording also violate the rules of evidence and [are] inadmissible on that basis as well.

ASSIGNMENT OF ERROR III: Mr. Smith's conviction is against the manifest weight of evidence in violation of his rights to due process and a fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the State of Ohio Constitution.

ASSIGNMENT OF ERROR IV: As amended by S.B. 201, the revised code's sentences for first- and second-degree qualifying felonies violated the constitutions of the United States and the State of Ohio; accordingly, the trial court plainly erred in imposing a S.B. 201 indefinite sentence.

ASSIGNMENT OF ERROR V: Mr. Smith's Sixth Amendment right to a trial by jury was violated.

## II. Law and Analysis

### A. Admissibility of Bradley's Statements to Police as Captured in the March 21, 2020 Body Camera Footage

{¶ 72} In his first assignment of error, Smith asserts that his right of confrontation under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution was violated "when the trial court admitted testimonial statements made by the accuser, who did not testify, via police body camera recordings."[14]

{¶ 73} Smith contends that Bradley's statements regarding the March 21, 2020 incident are testimonial based on various factors identified in *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), and the

---

[14] Although body camera footage of statements by Bradley relating to both the March 21, 2020 and December 26, 2020 incidents were admitted into evidence at trial, on appeal, Smith challenges only the admission of the body camera footage of Bradley's statements related to the March 21, 2020 incident.

"objective witness test" adopted by the Ohio Supreme Court in *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 36.[15]

{¶ 74} The state responds that Bradley's statements regarding the March 21, 2020 incident were nontestimonial because they were made "in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation [was] to enable police assistance to meet an ongoing emergency." (Appellee's Br. at 4.)

### 1. The Confrontation Clause

{¶ 75} Under both the United States and Ohio Constitutions, a criminal defendant has a right to confront witnesses. The Sixth Amendment's Confrontation Clause, which is binding on the states through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." Article I, Section 10 of the Ohio Constitution states that "[i]n any trial, in any court, the party accused shall be allowed * * * to meet the witnesses face to face."[16] The ""central concern"" of the

---

[15] As discussed in greater detail below, because this case involves the admissibility of statements made in the course of a police interrogation, we apply the "primary purpose test," not the "objective witness test," in determining whether Bradley's statements are testimonial.

[16] We note that it has been held that "[w]hile these constitutional provisions are not identical, the Ohio Constitution provides no greater right of confrontation than the Sixth Amendment." *In re H.P.P.,* 8th Dist. Cuyahoga Nos. 108860 and 108861, 2020-Ohio-3974, ¶ 20, citing *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 12. Although Smith claims a violation of his confrontation rights under both Article I, Section 10 of the Ohio Constitution the Sixth and Fourteenth Amendments to the United States Constitution, he does not claim that he was entitled to greater or different rights or protection under the Ohio Constitution than the United States Constitution.

Confrontation Clause is "'"to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."'" *State v. Smith*, 2019-Ohio-3257, 141 N.E.3d 590, ¶ 10 (1st Dist.), quoting *State v. Madrigal*, 87 Ohio St.3d 378, 384, 721 N.E.2d 52 (2000), quoting *Maryland v. Craig*, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990); *see also Michigan v. Bryant*, 562 U.S. 344, 358, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011) ("Even where * * * an interrogation is conducted with all good faith, introduction of the resulting statements at trial can be unfair to the accused if they are untested by cross-examination. Whether formal or informal, out-of-court statements can evade the basic objective of the Confrontation Clause, which is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial.").

{¶ 76} The admission of a testimonial, out-of-court statement by a declarant who does not testify at trial violates the Confrontation Clause unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177; *see also Garfield Hts. v. Winbush,* 187 Ohio App.3d 302, 2010-Ohio-1658, 931 N.E.2d 1148, ¶ 17 (8th Dist.) ("If a statement is testimonial, then the Confrontation Clause requires a showing of both the declarant's unavailability and the defendant's opportunity to have previously cross-examined the declarant. * * * If the statement is nontestimonial, it is merely subject to the regular admissibility requirements of

the hearsay rules."), citing *State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, ¶ 21.

{¶ 77} Regardless of whether Bradley was "available" to testify at trial, there is no dispute that Smith did not have a prior opportunity to cross-examine her regarding the statements at issue. Accordingly, if the statements Bradley made were testimonial, Smith was denied his right of confrontation.

### 2. "Testimonial" Statements and the Primary Purpose Test

{¶ 78} In *Crawford*, the Court held that statements made by the defendant's wife during a police interrogation while in police custody were testimonial and could not be admitted under the Confrontation Clause when the wife did not testify at trial. *Crawford*, 541 U.S. at 38-41, 65-66, 68-69, 124 S.Ct. 1354, 158 L.Ed.2d 177. *Crawford* did not offer an "exhaustive definition" of what constitutes a "testimonial" statement. *Ohio v. Clark*, 576 U.S. 237, 243, 135 S.Ct. 2173, 192 L.Ed.2d 306 (2015); *Crawford* at 68 ("We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'"). However, the Court stated that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68. Following *Crawford*, courts have "labored to flesh out what it means for a statement to be 'testimonial.'" *Clark* at 244.

{¶ 79} The United States Supreme Court announced the "primary purpose test" in *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Where a statement is made "in the course of police interrogation" whether a

statement is testimonial depends on the "primary purpose" of the statement. *Davis* at 822; *Bryant* at 370. The Court explained that statements are nontestimonial "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis* at 822. Statements are testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.*[17]

{¶ 80} *Davis* identified four characteristics that distinguish nontestimonial statements from testimonial statements: (1) the declarant describes contemporaneous events as they are actually occurring rather than describing past events, (2) an objective ongoing emergency exists, (3) the nature of what is asked and answered, viewed objectively, is necessary to be able to resolve the emergency and (4) the interview is of an informal nature. *Davis* at 826-828; *see also Cleveland v. Johnson*, 8th Dist. Cuyahoga No. 107930, 2019-Ohio-3286, ¶ 18.

{¶ 81} In *Davis*, the victim did not testify at Davis' trial; instead, the state introduced a recording of portions of her conversation with the 911 operator. The issue in that case was whether the portion of the victim's 911 call identifying Davis as her assailant was testimonial. *Id.* at 829. At the beginning of the call, the victim

---

[17] The fact that statements may be "volunteered" during an interaction with police does not preclude them from being testimonial. *Davis* at 822-823, 827, fn. 1 (noting that "volunteered testimony" is still testimony and remains subject to the requirements of the Confrontation Clause).

told the 911 operator that "[h]e's here jumpin' on me again," that "[h]e's usin' his fists" and that her assailant had not been drinking. The 911 operator then asked the victim the name of her assailant. After she identified her assailant as Davis, the victim told the operator, "He's runnin' now." The victim informed the 911 operator that Davis had "just r[un] out the door" and that he was leaving in a car with someone else. *Id.* at 817-818. The Court held that the portion of the 911 call that included the identification of Davis as the assailant was non-testimonial because (1) the victim was "speaking about events as they were actually happening" rather than describing past events, (2) the victim's call was "plainly a call for help against a bona fide physical threat," (3) the victim's "frantic answers were provided over the phone, in an environment that was not tranquil, or even * * * safe" and (4) the "nature of what was asked and answered * * * viewed objectively, was such that the elicited statements were necessary to be able to resolve the present emergency" rather than simply learn what had happened in the past. (Emphasis deleted.) *Id.* at 827.

{¶ 82} However, the Court cautioned that other portions of the 911 call — i.e., the victim's statements to the 911 operator after Davis had left the premises — could be testimonial:

> In this case, for example, after the operator gained the information needed to address the exigency of the moment, the emergency appears to have ended (when Davis drove away from the premises). The operator then told [the victim] to be quiet, and proceeded to pose a battery of questions. It could readily be maintained that, from that point on, [the victim's] statements were testimonial, not unlike the "structured police questioning" that occurred in *Crawford*, 541 U.S. at 53, fn. 4, 124 S.Ct. 1354, 158 L.Ed.2d 177.

*Davis* at 828-829. The Court noted that the Washington Supreme Court had concluded that even if later parts of the call were testimonial, their admission was harmless beyond a reasonable doubt. Because Davis did not challenge that holding, the court simply "assume[d] it to be correct" and did not further address the issue. *Id.* at 829; *see also Bryant*, 562 U.S. at 363, 131 S.Ct. 1143, 179 L.Ed.2d 93.

{¶ 83} In *Bryant*, the United States Supreme Court clarified "what *Davis* meant" by "an ongoing emergency" and its role in determining the "primary purpose" of an interrogation. *Bryant*, 562 U.S. at 359, 131 S.Ct. 1143, 179 L.Ed.2d 93. In that case, the Court held that statements a mortally wounded shooting victim made to police officers about his assailant (i.e., the identity and description of the shooter and the location of the shooting) in a gas station parking lot (after he had been shot by the assailant outside the assailant's house and had driven himself to the parking lot) were not testimonial because the circumstances objectively indicated that the primary purpose of the interrogation was to enable police assistance to address an ongoing emergency, rather than to establish evidence for prosecution. The victim was unavailable to testify at trial because he died shortly after the shooting, so police officers testified at trial about what the victim had told them. *Id.* at 348-350.

{¶ 84} In *Bryant*, the Court indicated that "*Davis* requires a combined inquiry that accounts for both the declarant and the interrogator" and that "[i]n many instances, the primary purpose of the interrogation will be most accurately ascertained by looking to the contents of both the questions and the answers."

*Bryant* at 367-368. The Court held that, in applying the primary purpose test, courts must objectively evaluate "all of the relevant circumstances" and determine "the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred":

> An objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the "primary purpose of the interrogation." The circumstances in which an encounter occurs — e.g., at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards — are clearly matters of objective fact. The statements and actions of the parties must also be objectively evaluated. That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred. * * * When a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the "primary purpose of the interrogation" by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs.

*Id.* at 359-360, 369, 370-371.

{¶ 85} Addressing the significance of an "ongoing emergency" in determining whether a declarant's statements are testimonial, the Court stated that although "the existence vel non of an ongoing emergency" is not "dispositive of the testimonial inquiry," it is "among the most important circumstances" that "informs

the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Bryant*,

562 U.S. at 361, 367, 374, 131 S.Ct. 1143, 179 L.Ed.2d 93.[18]  The Court explained:

> The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than "prov[ing] past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224.  Rather, it focuses them on "end[ing] a threatening situation." *Id.* at 832.  Implicit in *Davis* is the idea that because the prospect of fabrication in statements given for the primary purpose of resolving that emergency is presumably significantly diminished, the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination.

*Bryant* at 361.  In other words:

> The existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is testimonial because statements made to assist police in addressing an ongoing emergency presumably lack the testimonial purpose that would subject them to the requirement of confrontation. * * * [T]he existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public.

*Id.* at 370-371. "[W]hether an emergency exists and is ongoing is a highly context-dependent inquiry." *Id.* at 363.[19]

---

[18] Although the United States Supreme Court has recognized that "there may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony," *see Bryant* at 358; *Clark*, 576 U.S. at 244-245, 135 S.Ct. 2173, 192 L.Ed.2d 306, no one has claimed that any such "other circumstance" existed in this case.  Accordingly, we do not further address that issue here.

[19] Factors the Court identified as relevant to determining whether an ongoing emergency exists include:  whether physical violence is presently occurring; whether the dispute is a private or public dispute; whether there is an ongoing threat to police or the public; whether the perpetrator's location is known or unknown; whether the perpetrator and victim are separated; the motive(s) of the perpetrator (if known); whether the perpetrator is armed and, if so, the type of weapon(s) the perpetrator has; the victim's

{¶ 86} Once Smith objected to the admissibility of Bradley's out-of-court statements, the state, as the proponent of the evidence, bore the burden of establishing the admissibility of the statements. *See, e.g., State v. Hill*, 12th Dist. Butler No. CA80-05-0053, 1981 Ohio App. LEXIS 14266, 4 (Mar. 1, 1981) ("The burden of proving facts which must be established to make evidence admissible is upon the party seeking to introduce the evidence."); *cf. State v. Stover*, 9th Dist. Wayne No. 13CA0035, 2014-Ohio-2572, ¶ 12 (the state, as the party seeking to admit statement under excited-utterance exception to the hearsay rules, had the burden to prove that the statement was made while the declarant was still under the stress of the event); *see also United States v. Duron-Caldera*, 737 F.3d 988, 993 (5th Cir.2013) ("'[T]he government bears the burden of defeating [a] properly raised Confrontation Clause objection by establishing that its evidence is nontestimonial.'"), quoting *United States v. Jackson*, 636 F.3d 687, 695, fn. 4 (5th Cir.2011); *United States v. Arnold*, 486 F.3d 177, 192 (6th Cir.2007) (noting that "the government ha[d] met its burden of proving that [declarant's] statements to the 911 operator and at the scene were nontestimonial"). We review evidentiary rulings that implicate the Confrontation Clause de novo. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 97.

{¶ 87} The state contends that this case is akin to *State v. Tomlinson*, 8th Dist. Cuyahoga No. 109614, 2021-Ohio-1301. In *Tomlinson*, this court held that

---

medical condition and whether medical assistance is required and whether the scene is secured. *See generally Bryant*.

statements by two witness to a drive-by shooting, which were recorded by police body cameras, were not testimonial where they were "made to law enforcement in the course of responding to an emergency situation" and "[t]he victims had just been shot at and called the police to seek protection and medical treatment." *Id.* at ¶ 43. *Tomlinson* contains limited information regarding the circumstances surrounding the witness statements in that case and the specific inquiries made by police in eliciting those statements. Nevertheless, we believe that *Tomlinson* is readily distinguishable from the facts here.

{¶ 88} In *Tomlinson*, the defendant had allegedly shot at three individuals while they were in a vehicle then left the scene. *Id.* at ¶ 14. Prior to the shooting, Cleveland police detectives had been monitoring the defendant's social media accounts due to concerns related to "feuds among different neighborhood groups." *Id.* at ¶ 10, 15. After the shooting, two of the victims called police "to seek protection and medical treatment" and remained at the scene. *Id.* at ¶ 14. When police arrived at the scene, approximately 40 minutes after the shooting, and began questioning the victims, the victims were "very excited and emotional about what had just happened to them." *Id.* At the time the police were questioning the victims, their assailant, armed with a gun, was still at large, location unknown, presenting an immediate continuing threat to the victims who remained at the scene, the police and the public, and the victims were apparently still in need of medical treatment. *Id.* at ¶ 14, 43. In *Tomlinson*, the totality of the circumstances objectively indicated that the emergency for which the victims sought police assistance was still ongoing

at the time of the interrogation and that the primary purpose of both the police in questioning the victims and the victims in responding to those inquiries was to resolve an ongoing emergency. This case is different.

{¶ 89} We recognize that an ongoing emergency can exist after the original threat to the victim has ceased to exist if there is a continuing threat to police or the public or the victim is in need of emergency medical services. However, this does not mean that an alleged victim's responses to "initial inquiries" by police officers are always testimonial. *See Davis*, 547 U.S. at 832, 126 S.Ct. 2266, 165 L.Ed.2d 224 (rejecting the "implication that virtually any 'initial inquiries' at the crime scene" will be non-testimonial). *Bryant* instructs that a court must consider "all of the relevant circumstances," including whether an ongoing emergency exists and the perspectives of both the declarant and the interrogator in determining the primary purpose of an interrogation and whether a declarant's statements are testimonial. *Bryant*, 562 U.S. at 369, 131 S.Ct. 1143, 179 L.Ed.2d 93. Furthermore, "'a conversation which begins as an interrogation to determine the need for emergency assistance' can 'evolve into testimonial statements once the initial purpose has been achieved.'" *Bryant*, 562 U.S. at 365, 131 S.Ct. 1143, 179 L.Ed.2d 93, quoting *Davis*, 547 U.S. at 828, 126 S.Ct. 2266, 165 L.Ed.2d 224 (internal quotation marks omitted). Such an "evolution" may occur if "a declarant provides police with information that makes clear that what appeared to be an emergency is not or is no longer an emergency or that what appeared to be a public threat is actually a private dispute"

or "if a perpetrator is disarmed, surrenders, is apprehended, or * * * flees with little prospect of posing a threat to the public." *Bryant* at 365.

{¶ 90} In this case, the incident allegedly occurred somewhere in the street on the other side of town, away from Bradley's home. Before police arrived, Bradley had left the scene of the incident and had walked to the home of a family member. It is unclear from the record how far the relative lived from the scene of the incident. Smith had allegedly left the scene shortly after the incident and there is nothing in the record to suggest Smith knew where Bradley was or that he otherwise posed an immediate, continuing threat to Bradley once she arrived at the home of her family member.

{¶ 91} It is unknown exactly how much time elapsed between the incident and the officers' interrogation of Bradley, but it is clear that the interrogation was not conducted immediately after the incident. According to Bradley, after the incident, she snorted cocaine and then walked to the home of the family member, who called 911. By the time police arrived and began questioning Bradley, she was already in an ambulance, in the custody of EMS personnel, receiving medical care and preparing to be transported to the hospital. Thus, by the time police questioned Bradley, she was no longer "acting * * * to secure protection or medical care." *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 183. Although Bradley had not yet been transported to the hospital, from her perspective, the "emergency" for which she needed police assistance had effectively ended before police began questioning her. *Cf. State v. Steele*, 8th Dist. Cuyahoga No. 91571,

2009-Ohio-4704, ¶ 39 (statements victim made to police officer while in the ambulance and at the emergency room were testimonial because emergency no longer existed).

{¶ 92} Here, the dispute that allegedly led to the assault was a private dispute, the alleged assailant was known to Bradley and there is nothing in the record to indicate that he presented an immediate physical threat to Bradley, police or the public at the time of the officers' interrogation of Bradley. Police did not ask Bradley, during their initial interview, whether Smith had a weapon or otherwise focus on any exigent threat or safety concern in their questioning. The questions police posed to Bradley were directed to investigating and documenting what had happened — i.e., determining the identity of Bradley's alleged assailant and what had occurred. These elicited statements were not "'necessary to be able to resolve [a] present emergency,'" but rather "'to learn * * * what had happened in the past.'" (Emphasis deleted.) *Bryant*, 562 U.S. at 367, 131 S.Ct. 1143, 179 L.Ed.2d 93, quoting *Davis*, 547 U.S. at 827, 126 S.Ct. 2266, 165 L.Ed.2d 224.

{¶ 93} Viewed objectively, the totality of the circumstances surrounding the March 21, 2020 police interview of Bradley demonstrates that the "primary purpose" of Bradley's statements to police, in which Bradley identified Smith as her assailant and described what he had done, was to provide an account of the assault that had allegedly occurred — i.e., to document past events for purposes of a later criminal investigation or prosecution — and that the statements were, therefore, testimonial. Bradley's statements to police were simply "'a weaker substitute for live

testimony' at trial." *Davis* at 828, quoting *United States v. Inadi*, 475 U.S. 387, 394, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986); *cf. Smith*, 2019-Ohio-3257, 141 N.E.3d 590, at ¶ 13 (declarant's statements were testimonial where police did not "focus on any exigent threat or safety concern in their questioning" but rather "asked about what had happened, rather than what was happening, procuring information about the past course of events, which then led to the charges against [defendant]"); *Toledo v. Green*, 2015-Ohio-1864, 33 N.E.3d 581, ¶ 21-25 (6th Dist.) (where victim and alleged perpetrator were in separate rooms, the victim "seemed a little upset" and "was a little bit loud" when police arrived and there was no bona fide physical threat to the victim at the time of her statements to police, no ongoing emergency existed and victim's statements to police were testimonial); *Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, at ¶ 156-159 (witness' statements to police were testimonial where witness called police to report that her husband had confessed to killing a woman, witness was not at an active crime scene, no gun was involved in the murder and although police were still trying to identify and apprehend an at-large perpetrator, who "initially * * * appeared to pose a continuing threat to [witness] and maybe others," police contact with witness was "did not occur in the midst of an ongoing emergency").

{¶ 94} The fact that Bradley's statements to police were presented through the playing of Soucek's body camera footage does not alter our analysis. The purpose of body cameras is to record events in which law enforcement officers are involved to improve officer safety, increase evidence quality, reduce civilian

complaints and reduce agency liability, *see* Hyland, Bureau of Justice Statistics, *Body-Worn Cameras in Law Enforcement Agencies, 2016* (Nov. 2018) — not to supplant the in-court testimony of witnesses.  Out-of-court statements that would otherwise be inadmissible do not become admissible simply because they were captured on a police body camera.

{¶ 95} This is yet another case in which the state of Ohio proceeded to trial without the alleged "victim"/witness.  This case is part of a disturbing trend favoring "victimless" prosecutions.  *See* the state's oral argument in *State v. Johnson*, 8th Dist. Cuyahoga No. 110942 ("There are attempts frequently to do victimless prosecutions * * *[.] There is a thought, at least among some prosecutors, that it favors community and favors victims to be able to put on a case.").[20]  Professors Richard Friedman and Bridget McCormack described this practice in their law review article, *Dial-In Testimony*:

> Often * * * prosecutors do not bother with an unwilling or recanting complainant.  Rather, they simply go forward without her, and instead of her live testimony, submit as evidence of the incident the statements carefully taken from her by the 911 operator and the police.  In some cases, the prosecutor's decision to pursue a "victimless" prosecution is based on a well-founded belief that the defendant's misconduct has inhibited the complainant from testifying.  But often the prosecutor evidently concludes that it is easier to go forward with unsworn, untested statements provided on the 911 tapes than to expose a witness to the risks of testifying at trial.

---

[20] Pursuant to App.R. 21(J), recordings of these oral arguments are available for review upon request.

Richard D. Friedman and Bridget McCormack, *Dial-In Testimony*, 150 U.Pa.L. Rev. 1171, 1189-1190 (2002).

{¶ 96} During oral argument, the state indicated that it had not requested a bench warrant to compel Bradley's appearance as a material witness at trial and acknowledged that it can be "easier to go without the victim in these cases." Here, it may have very well been "easier" for the state to attempt to make a case against Smith without Bradley testifying and being subject to cross-examination. Based on the limited information in the record, Bradley may not been the strongest witness had she testified at trial. Bradley, who was five months pregnant at the time of the March 21, 2020 incident, admitted that she had been drinking prior to the incident and that she had snorted cocaine — prior to her interactions with police and medical providers — after the incident. It is unknown the extent to which Bradley's substance abuse may have affected her perception, recollection or ability to accurately relate what had occurred.[21] As such, presenting Bradley's testimony live

---

[21] It is well-recognized that a witness' alcohol or drug use at the time of an incident can affect the witness' perception of, recollection of and ability to describe what occurred, impacting his or her credibility. *See, e.g., State v. Fast*, 2021-Ohio-2548, 176 N.E.3d 361, ¶ 80-81 (11th Dist.) ("Evidence of a witness's drug use may be probative of his or her capacity or ability to observe, remember, or relate[.] * * * '[T]he credibility of testimony can be attacked through evidence of a witness's intoxication at the time of the matter about which the witness seeks to testify. * * * Such evidence is relevant to the issue of credibility, since it questions the ability of the witness to correctly perceive the events which allegedly occurred.'"), quoting *Kenney v. Fealko*, 75 Ohio App.3d 47, 51, 598 N.E.2d 861 (11th Dist.1991). Where a witness testifies, the impact of a witness' alcohol or drug use on his or her observation, perception, recollection and accurate relation of what occurred can be explored and tested through effective cross-examination. *See, e.g., State v. Smith*, 6th Dist. Lucas Nos. L-16-1306, L-16-1307 and L-16-1308, 2018-Ohio-3983, ¶ 16 ("Where a witness has been examined about his or her drug use, the trier of fact can properly weigh the credibility of the witness' testimony."). Here, however, because Bradley did not testify, Smith had no such opportunity.

(rather than through body camera footage) and subjecting her to cross-examination may very well have weakened the state's case. However, the exceptions to live witness testimony authorized in *Davis*, *Bryant* and their progeny were not intended to enable prosecutors to make tactical decisions not to bring in a victim (or alleged victim) to testify at trial to avoid subjecting his or her testimony to scrutiny under cross-examination.

{¶ 97} As the United States Supreme Court has cautioned:

Domestic violence is an intolerable offense that legislatures may choose to combat through many means — from increasing criminal penalties to adding resources for investigation and prosecution to funding awareness and prevention campaigns. But for that serious crime, as for others, abridging the constitutional rights of criminal defendants is not in the [s]tate's arsenal.

*Giles v. California*, 554 U.S. 353, 376, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008).

{¶ 98} Smith testified that Barbara Bradley had stated to him in the past that she would take revenge on him when she thought he was "cheating" on her and that, during a telephonic conversation between them while he was incarcerated in the Cuyahoga County Jail she informed him that she was not going to present herself at the court to testify as "I already told you. You ain't did nothing."

{¶ 99} Trial courts need to hold the prosecution and the "victims" accountable in these matters. If the "victim" chooses not to appear to testify, there are options available to the state. When service of a subpoena has been perfected, a bench warrant can be issued. If the state cannot proceed to trial, a case can be

dismissed without prejudice and refiled at a time when the "victim" sees the folly of their way.

{¶ 100} We recognize that some prosecutions can go forward without a "victim" but that should be the exception and not the rule.

{¶ 101} Because Bradley's statements relating to the March 21, 2020 incident were testimonial and Smith did not have an opportunity to cross-examine Bradley regarding those statements, the trial court's admission of those statements violated the Confrontation Clause.

### 3. Harmless Error

{¶ 102} Having determined that the trial court erred in admitting the body camera footage of Bradley's statements relating to the March 21, 2020 incident, we must now consider whether that error was reversible error or harmless error. *Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, at ¶ 178 ("Confrontation Clause claims are * * * subject to harmless-error analysis."), citing *McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, at ¶ 192.

{¶ 103} Crim.R. 52(A) addresses harmless error in the context of criminal cases. It provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." *See also* R.C. 2945.83(C) ("No motion for a new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court because of * * * [t]he admission or rejection of any evidence offered against or for the accused unless it affirmatively appears on the record that the accused was or may have been prejudiced thereby."). Under the harmless-error

standard of review, the state bears the burden of demonstrating that the error did not affect the substantial rights of the defendant. *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 55; *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15. Smith asserts that "without the March body camera recording, a conviction on the March incident would be impossible under the circumstances." The state did not address the issue. It addressed only the issue of admissibility in its appellate brief.

{¶ 104} In *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, the Ohio Supreme Court set forth a three-part analysis "to guide appellate courts" in determining whether an error in the admission of evidence has affected the substantial rights of a defendant, thereby requiring a new trial, or whether admission of that evidence was harmless error:

> First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. [*Morris*] at ¶ 25, 27. Second, it must be determined whether the error was not harmless beyond a reasonable doubt. *Id.* at ¶ 28. Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt. *Id.* at ¶ 29, 33.

*State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37; *see also State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44, ¶ 63.

{¶ 105} Applying this analysis to the evidence in this case, we find that the erroneous admission of Bradley's statements to police regarding the March 21, 2020 incident was not harmless error and affected Smith's substantial rights.

{¶ 106} "[W]hile courts may determine prejudice in a number of ways and use language that may differ, * * * both the nature of the error and the prejudice to defendant (the measure of how the error affected the verdict) are important." *Morris* at ¶ 25, 33. As such, when determining whether a new trial is required or error is harmless beyond a reasonable doubt, "an appellate court must consider both the impact of the offending evidence on the verdict and the strength of the remaining evidence." *Id.* at ¶ 33. Error in the admission of evidence is harmless beyond a reasonable doubt when "'there is [no] reasonable possibility that the improperly admitted evidence contributed to the conviction.'" *McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, at ¶ 192, quoting *Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). As a general matter, "'"the cases where imposition of harmless error is appropriate must involve either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction."'" *Morris* at ¶ 29, quoting *State v. Rahman*, 23 Ohio St.3d 146, 151, 492 N.E.2d 401 (1986), quoting *State v. Ferguson*, 5 Ohio St.3d 160, 166, 450 N.E.2d 265 (1983), fn. 5.

{¶ 107} In this case, the improperly admitted evidence was clearly prejudicial, linking Smith to the crimes for which he was ultimately convicted. Further, this is not a case in which the state's evidence was so overwhelming that it is clear that the improperly admitted evidence did not affect the outcome. To the contrary, the state's case against Smith relating to the March 21, 2020 incident was based almost exclusively on the statements Bradley made to police as captured on

the body camera footage. The evidence relating to the March 21, 2020 incident that remains once the improperly admitted evidence of Bradley's statements to police is removed from consideration is video footage and photographs showing Bradley's injuries and Smith's testimony about what allegedly occurred.[22] That evidence was insufficient to support Smith's convictions relating to the March 21, 2020 incident.

{¶ 108} Following a thorough review of the record before us, considering both the potential impact of the improperly admitted evidence on the verdict and the strength (or weakness) of the remaining evidence after the improperly admitted evidence is removed from consideration, we cannot say that the trial court's erroneous admission of the body camera footage containing Bradley's statements to police regarding the March 21, 2020 incident was harmless beyond a reasonable doubt. We find that the trial court's admission of this improper evidence contributed to Smith's convictions in 651674, was not harmless error and affected Smith's substantial rights.

---

[22] In considering whether the trial court's admission of Bradley's statements was harmless error, we are mindful that Smith stipulated to the admissibility of Bradley's medical records, which includes an "emergency department – visit note" recording a "history * * * provided by the Patient" that includes a description of the incident purportedly provided by Bradley  It is unclear from the record when or under what circumstances the "history" information identified as having been "provided by the Patient" was provided, i.e., whether it was provided in response to the officers' questioning of Bradley in the presence of EMS personnel while she was receiving medical care in the ambulance, whether it was provided in response to officers' questions at the hospital or whether it was provided in response to inquiries by medical providers at some other time. Because it appears from the record that that stipulation was made only after the trial court denied Smith's motion in limine relating to those records and admitted, over Smith's objections, the body camera footage containing the statements Bradley had made to police in the ambulance regarding the March 21, 2020 incident, we do not believe Smith's stipulation to the admissibility of the medical records compels a different result on the issue of harmless error here.

{¶ 109} We sustain Smith's first assignment of error. Accordingly, in 651674 only, we reverse the judgment of the trial court, vacate Smith's convictions and remand for a new trial.

{¶ 110} Smith contends that, based on the erroneous admission of Bradley's testimonial statements relating to the March 21, 2020 incident, we should not only overturn Smith's convictions in 651674 relating to the March 21, 2020 incident, but also his convictions in 655568 relating to the December 26, 2020 incident, asserting that because the accuser is the same in both cases and the "accusations * * * are similar," "there is no way to remove the impact that this evidence would have had on the trial as a whole." We disagree.

{¶ 111} This was a bench trial. The trial court was fully capable of separating the evidence relating to the March 21, 2020 incident from the evidence relating to the December 26, 2020 incident in rendering its verdicts. Smith has not assigned as error on appeal the joinder of the two cases for trial. There is nothing in the record to suggest that the trial court considered improperly admitted evidence related to the March 21, 2020 incident in 651674 when rendering its verdicts against Smith related to the December 26, 2020 incident in 655568.

{¶ 112} Based on our resolution of Smith's first assignment of error, his second assignment of error is moot. Likewise, his third, fourth and fifth assignments of error are moot to the extent they relate to 651674.

**Manifest Weight of the Evidence**

{¶ 113} In his third assignment of error, Smith contends that his convictions in 655568 for felonious assault in violation of R.C. 2903.11(A)(1) (Count 1), felonious assault in violation of R.C. 2903.11(A)(2) (Count 2) and domestic violence in violation of R.C. 2919.25(A) are against the manifest weight of the evidence.

{¶ 114} A manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. "'[W]eight of the evidence involves the inclination of the greater amount of credible evidence.'" *State v. Harris*, 8th Dist. Cuyahoga No. 109060, 2021-Ohio-856, ¶ 32, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). On a manifest weight challenge, "a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25.

{¶ 115} When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn therefrom, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversal on manifest weight grounds is reserved for the

"'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶ 116} Smith contends that his convictions in 655568 are against the manifest weight of the evidence because (1) "[t]here are discrepancies in Bradley's description of events and the injuries she sustained," (2) "[t]here are conflicts in Bradley's different versions as they were entered into evidence as recorded out-of-court statements," (3) "[t]here are serious conflicts in the evidence that should call Bradley's credibility into question when she says that [Smith] is the one who injured her" and (4) "[w]e cannot know what Bradley would have said about these things in her testimony because the [s]tate tried the case without her." Smith further argues that his convictions are against the against the manifest weight of the evidence because (1) as Bradley spoke with law enforcement, "the firearm took on greater and greater significance with every retelling," (2) Bradley's injuries, as depicted in the police photographs, are not consistent with Bradley having been pistol-whipped and (3) "there is no mention of [a] gun in the investigating detective's report."

{¶ 117} The state responds that there was a "wealth of evidence" supporting Smith's convictions, including the 911 call, the body camera footage and photographs of Bradley's injuries, and disputes Smith's claim that Bradley's statements were inconsistent.

{¶ 118} To convict Smith of felonious assault as charged in Count 1, the state needed to prove beyond a reasonable doubt that Smith "knowingly * * * [c]ause[d] serious physical harm to another." R.C. 2903.11(A)(1). To convict Smith of felonious

assault as charged in Count 2, the state needed to prove beyond a reasonable doubt that Smith "knowingly * * * [c]ause[d] or attempt[ed] to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2). To convict Smith of domestic violence as charged in Count 3, the state needed to prove beyond a reasonable doubt that Smith "knowingly cause[d] or attempt to cause physical harm to a family or household member" and that he had been previously convicted of a domestic violence offense. R.C. 2919.25(A), (D)(3). To support guilty verdicts on the one-year and three-year firearm specifications included in these counts, the state needed to prove beyond a reasonable doubt that Smith had a firearm on or about his person or under his control while committing the offense and displayed the firearm, brandished the firearm, indicated that he possessed the firearm or used it to facilitate the offense. R.C. 2941.141(A), 2941.145(A).

{¶ 119} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶ 120} "Physical harm" means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). "Serious physical harm" includes "[a]ny physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement." R.C. 2901.01(A)(5)(d). Facial swelling and lacerations that require stitches have frequently been held to constitute "serious physical harm." *See, e.g., State v. Finley*,

8th Dist. Cuyahoga No. 108062, 2019-Ohio-3891, ¶ 28 ("'This court has consistently held that the need for stitches constitutes serious physical harm for purposes of a felonious assault conviction.'"), quoting *State v. Studgions*, 8th Dist. Cuyahoga No. 94153, 2010-Ohio-5480, ¶ 10; *State v. Williams*, 8th Dist. Cuyahoga No. 98210, 2013-Ohio-573, ¶ 19 ("This court has repeatedly held that the element of serious physical harm is satisfied when the evidence shows that the victim sustained injuries requiring medical treatment, including stitches."). Serious physical harm has also been found where a victim sustains a bloody cut and/or significant swelling to the face, even where there is no evidence stitches were required. *See, e.g., State v. Payne*, 8th Dist. Cuyahoga No. 76539, 2000 Ohio App. LEXIS 3274, 9-10 (July 20, 2000) (bloody, cut and swollen right eye was sufficient to establish serious physical harm because the injury was a temporary, serious disfigurement); *see also State v. Scott*, 1st Dist. Hamilton Nos. C-200385 and C-200403, 2021-Ohio-3427, ¶ 26, citing *State v. Crossty*, 2017-Ohio-8382, 99 N.E.3d 1048, ¶ 22 (1st Dist.).

{¶ 121} As detailed above, the state presented ample, credible evidence from which the trial court could have reasonably found beyond a reasonable doubt that Smith had pistol-whipped Bradley, a family or household member, had caused her serious physical harm or physical harm by means of a deadly weapon or dangerous ordnance and used a firearm to commit the offense.

{¶ 122} A conviction may rest solely on the testimony of a single witness, if believed, and there is no requirement that a witness' testimony be corroborated to be believed. *See, e.g., State v. Nicholson*, 8th Dist. Cuyahoga No. 110595, 2022-

Ohio-2037, ¶ 180; *State v. Flores-Santiago*, 8th Dist. Cuyahoga No. 108458, 2020-Ohio-1274, ¶ 38; *State v. Black*, 2019-Ohio-4977, 149 N.E.3d 1132, ¶ 43 (8th Dist.); *State v. Schroeder*, 2019-Ohio-4136, 147 N.E.3d 1, ¶ 84 (4th Dist.). Likewise, a conviction is not against the manifest weight of the evidence "solely because the [factfinder] heard inconsistent or contradictory testimony." *State v. Rudd*, 8th Dist. Cuyahoga No. 102754, 2016-Ohio-106, ¶ 72, citing *State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38; *State v. Nitsche*, 2016-Ohio-3170, 66 N.E.3d 135, ¶ 45 (8th Dist.) ("A defendant is not entitled to reversal on manifest weight grounds merely because certain aspects of a witness's testimony are not credible or were inconsistent or contradictory."); *see also State v. Mann*, 10th Dist. Franklin No. 10AP-1131, 2011-Ohio-5286, ¶ 37 ("'While the [factfinder] may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.'"), quoting *State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 Ohio App. LEXIS 2245, 7 (May 28, 1996).

{¶ 123} Although Bradley made no mention of a gun to Cunningham when he interviewed her by telephone after the incident, Bradley told McDougler in the 911 call that Smith had "beat [her] with a gun." Bradley likewise told Melbar and Germaine that Smith had struck her twice in the head with a gun, causing her injuries. Smith has not shown that these statements by Bradley were so inherently incredible or unreliable as to preclude a reasonable fact finder from believing them. Bradley's statements to McDougler were made as Smith was leaving the couple's

home immediately following the incident. Her statements to Melbar and Germaine were made while she was sitting in her home, still bleeding, in pain and in need of medical care, shortly after the incident. In both instances, it appears that Bradley was under the stress and excitement of the incident that had just occurred.

{¶ 124} Cunningham interviewed Bradley later, when she was, as he described it, "a little relaxed," "kind of still upset, but not frantic or anything" and had an opportunity for reflection. The trial court could have reasonably determined that Bradley's statements immediately following the incident were more credible than those made after reflection, i.e., after Bradley realized Smith had been arrested and could be sent to prison for what he had done. The injuries Bradley sustained, as depicted on the body camera footage and in the police photographs, were consistent with Bradley having been pistol-whipped on the head. Smith's convictions were not against the manifest weight of the evidence merely because the trial court believed the testimony of the state's witnesses and Bradley's statements that Smith had caused her injuries over the testimony of Smith, where, as here, the trial court could reasonably make that choice. *See, e.g., State v. Nash*, 1st Dist. Hamilton Nos. C-210435 and C-210436, 2022-Ohio-1516, ¶ 13 ("[A] conviction is not against the weight of the evidence merely because the trial court did not believe the defense testimony."). "A trier of fact is free to believe all, some, or none of the testimony of each witness appearing before it." *State v. Williams*, 2019-Ohio-794, 132 N.E.3d 1233, ¶ 28 (8th Dist.).

{¶ 125} The parties stipulated to evidence establishing that Smith had a prior conviction for domestic violence in 2012. Smith admitted that at the time of the December 26, 2020 incident, he was living with Bradley and that the couple was in a long-term relationship. Smith testified that he and Bradley had children together and that, due to the length of their relationship, he referred to Bradley as his wife. The responding officers testified regarding the severity of Bradley's injuries. Melbar testified that, when he saw Bradley after the incident, she was bleeding and was "really bad," with "severe swelling" and "a large laceration to her head" that required stitches. Germaine similarly testified that Bradley had "a very serious-looking head trauma with a lot of blood." Photographic evidence in the form of Melbar's body camera footage and photographs taken while Bradley received medical care at the hospital confirm the severity of Bradley's injuries. The trial court was entitled to give greater weight to this evidence than to Smith's testimony that Bradley had sustained "nothing but a little scratch," "a superficial scratch."

{¶ 126} Following a thorough review of the record, weighing the strength and credibility of the evidence presented and the reasonable inferences to be drawn therefrom, we cannot say that this is one of those "'exceptional cases'" in which the trier of fact clearly lost its way and created a manifest miscarriage of justice that the defendant's convictions must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. Accordingly, Smith's third assignment of error is overruled.

**Sentencing under the Reagan Tokes Law**

{¶ 127} In his fourth assignment of error, Smith contends that the trial court erred in 655568 in sentencing him to an indefinite sentence on Count 2 (felonious assault in violation of R.C. 2903.11(A)(2)) under the Reagan Tokes Law. Under the Reagan Tokes Law, qualifying first- and second-degree felonies committed on or after March 22, 2019 are subject to the imposition of indefinite sentences. Smith argues that the Reagan Tokes Law is unconstitutional because it violates his constitutional rights to trial by a jury, the separation-of-powers doctrine and his right to due process.

{¶ 128} The arguments presented in this case do not present novel issues or any new theory challenging the constitutional validity of any aspect of the Reagan Tokes Law left unaddressed by this court's en banc decision in *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.).[23] Accordingly, we overrule Smith's fourth assignment of error.

**Waiver of Jury Trial**

{¶ 129} In his fifth and final assignment of error, Smith claims that he was effectively denied his right to a jury trial in violation of the Sixth Amendment to the United States Constitution because, due to difficulties in scheduling jury trials as a result of COVID, he was faced with a "Hobson's Choice," i.e., "stay in jail waiting for a jury or have a bench trial."

---

[23] In his appellate brief, Smith acknowledges that "[t]he arguments challenging the constitutionality of S.B. 201's indeterminate sentencing provisions [raised in this appeal] were rejected by the *en banc* Court in *Delvallie*." (Appellant's Br. at 16.)

{¶ 130} On December 1, 2021, Smith executed a written waiver of his right to a jury trial in both cases. Before proceeding with the trial, the trial court read the written waiver into the record and then questioned Smith regarding his waiver of his right to a jury trial. The written waiver stated:

> I, GARY SMITH, the Defendant in this cause, hereby voluntarily waive and relinquish my right to a trial by jury, and elect to be tried by a judge of this Court of Common Pleas. I understand that I have a right, under the Constitutions and laws of both the United States and the State of Ohio, to a trial by a jury of twelve, and that no verdict could be made by a jury, except by agreement of all twelve members of that jury. I further state that no threats or promises have been made to induce me to waive this right, and that I am not under the influence of any drugs, alcohol, or medication that would affect my decision.

{¶ 131} On the record, the trial court confirmed with Smith and defense counsel that they had signed the jury waiver in both cases. The trial court advised Smith that the right to a jury trial is a constitutional right and confirmed that (1) defense counsel had explained Smith's right to a jury trial to him, (2) Smith understood the difference between a jury trial and a bench trial and (3) Smith was not under the influence of any drugs, alcohol or medication that could affect his decision to waive a jury trial.

{¶ 132} The trial court also specifically addressed the delays in scheduling jury trials due to COVID-19 and the potential impact of those delays on Smith's decision to waive his right to a jury trial:

> THE COURT: * * * I'm sure you also appreciate that it may be some time before we get a jury trial, but I don't want that to be the motivating factor, because there is a difference between one person being the trier of fact and 12 people having to reach a unanimous decision, so I just

want to make sure that you appreciate that difference. And are you confident that you want to proceed by bench trial today?

THE DEFENDANT: Yes.

{¶ 133} Following a colloquy with Smith and defense counsel, the trial court found that defense counsel had explained to Smith his rights to a trial by jury, that no threats or promises had been made to induce Smith to waive that right and that his jury waivers had been knowingly, intelligently and voluntarily executed. Accordingly, the trial court accepted Smith's jury waivers, and they were filed with the trial court.

{¶ 134} After accepting Smith's jury waivers, the trial court then proceeded to rule on Smith's motion to dismiss for lack of a speedy trial. In denying the motion to dismiss for lack of a speedy trial — a ruling Smith has not appealed — the trial court further noted:

> [D]ue to the Court's efforts to reduce the spread of the COVID-19 virus, and I don't have the specific dates, but for many months in the last year and a half we have not had access to jury panels and we were not calling in jury trials. When a determination was made between you and your counsel that we would go forward on a bench trial, this is the soonest that this Court could get your case called for trial. I've been in nonstop trials, your attorney has been in nonstop trials, the prosecutors have been in nonstop trials since we've resumed trials. * * * The delays have not been at the State's request. They've been in most part, and I haven't looked at the Court's docket, at the Court's request.

{¶ 135} In response to Smith's question regarding why his trial did not occur on May 3, 2021, which he claimed was his "first original trial date" after trials were allowed to resume, the trial court further stated:

I'll explain to you what happened with that. I lost all discretion over which of my cases could go to trial. My cases, I had to submit to our administrative judge, and the administrative judge through an administrative order decided which cases go. So does it pain me that you've been sitting in jail for pretrial purposes? Yes. I don't take any pleasure in that. But my jurisdiction and my discretion, a lot of it were removed due to the Court's administrative order. And as of November 1st, just one month ago, they've changed that process. But it was all the way through until November 1st I couldn't set my own trial dates. I couldn't. So we're trying to work through that, we're muddling through it. If it's an issue on appeal, then I would encourage you to raise it with the court of appeals.

{¶ 136} The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, guarantees an accused the right to trial by jury. *State v. Lomax*, 114 Ohio St.3d 350, 2007-Ohio-4277, 872 N.E.2d 279, ¶ 6, citing *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). A defendant may, however, waive that right. Crim.R. 23(A) states, in relevant part:

> In serious offense cases the defendant before commencement of the trial may knowingly, intelligently and voluntarily waive in writing his right to trial by jury. Such waiver may also be made during trial with the approval of the court and the consent of the prosecuting attorney.

{¶ 137} R.C. 2945.05 states:

> In all criminal cases pending in courts of record in this state, the defendant may waive a trial by jury and be tried by the court without a jury. Such waiver by a defendant, shall be in writing, signed by the defendant, and filed in said cause and made a part of the record thereof. It shall be entitled in the court and cause, and in substance as follows: "I, defendant in the above cause, hereby voluntarily waive and relinquish my right to a trial by jury, and elect to be tried by a Judge of the Court in which the said cause may be pending. I fully understand that under the laws of this state, I have a constitutional right to a trial by jury."

Such waiver of trial by jury must be made in open court after the defendant has been arraigned and has had opportunity to consult with counsel. Such waiver may be withdrawn by the defendant at any time before the commencement of the trial.

*See also Lomax* at ¶ 9 ("[T]o be valid, a [jury] waiver must meet five conditions. It must be (1) in writing, (2) signed by the defendant, (3) filed, (4) made part of the record, and (5) made in open court.").

{¶ 138} Smith does not dispute that his jury waivers complied with all applicable statutory and common law requirements. He, nevertheless, argues that the voluntariness of his jury waivers was undermined by administrative orders that suspended and/or limited the scheduling of jury trials, requiring him to "choose between continued confinement in the county jail and his right to a jury of his peers." Smith cites no authority in support of his claim that the temporary suspension of jury trials or other limits on the scheduling of jury trials due to COVID-19 violated the Sixth Amendment or invalidated his waiver of his right to a jury trial.

{¶ 139} The First District considered — and rejected — a similar argument in *State v. Fisher*, 2021-Ohio-3919, 180 N.E.3d 672 (1st Dist.), as follows:

This is an unusual case where Mr. Fisher concedes that he waived his right to a jury trial and that this waiver satisfied all of the statutory and caselaw requirements. Mr. Fisher nevertheless maintains that an administrative order suspending jury trials in Hamilton County because of the COVID-19 pandemic essentially undermined the voluntariness of his waiver. In other words, he insists that this administrative order posed an unconstitutional Hobson's choice—wait indefinitely for the resumption of jury trials or forego that cherished right.

Mr. Fisher cites no authority for the proposition that a temporary suspension of jury trials violated the Sixth Amendment, nor any cases

invalidating waivers of the right to a jury trial made during such a suspension. While we realize that the suspension of jury trials placed Mr. Fisher (along with countless others) in a predicament, we see no reason to disturb an otherwise valid waiver on this record.

*Id*. at ¶ 17-18. We agree with the reasoning of *Fisher*.

{¶ 140} Further, in this case, the record reflects that Smith's decision to waive a jury trial was not due solely to COVID-19-related difficulties in scheduling a jury trial. Before trial commenced, defense counsel informed the trial court that it was not only the delay in scheduling a jury trial but concerns regarding how a jury might perceive some of the evidence against Smith relating to the December 26, 2020 incident — the admissibility of which Smith does not challenge on appeal — that led Smith to choose a bench trial rather than wait for a jury trial. (Tr. 11) ("That's one of the reasons that we waived a jury, because the jury gets hold of that, they don't ignore it, and it hurts me and it hurts my defense.").

{¶ 141} In addition, it was only after Smith violated the terms of his bond in 651674, i.e., by admittedly having contact with Bradley, and then failed to appear for a hearing on the state's motion to revoke bond, that his bond was revoked, and Smith was required to await trial in jail rather than remaining free on bond.

{¶ 142} On the record before us, we see no reason to disturb Smith's valid jury waivers. Smith's fifth assignment of error is overruled.

{¶ 143} Judgment in 655568 affirmed; judgment in 651674 reversed; convictions in 651674 only vacated; 651674 only remanded for a new trial.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

MARY EILEEN KILBANE, J., CONCURS;
MICHELLE J. SHEEHAN, J., CONCURS IN JUDGMENT ONLY AND DISSENTS IN PART (WITH SEPARATE OPINON)

N.B. Judge Mary Eileen Kilbane joined the dissenting opinion by Judge Lisa B. Forbes and the concurring in part and dissenting in part opinion by Judge Anita Laster Mays in *Delvallie* and would have found the Reagan Tokes Law unconstitutional.

MICHELLE J. SHEEHAN, J., CONCURRING IN JUDGMENT ONLY IN PART AND DISSENTING IN PART:

{¶ 144} Respectfully, I concur in judgment only with the majority opinion affirming Garry Smith's convictions in Cuyahoga C.P No. 655568 and the resolution of Smith's fourth and fifth assignments of error. However, I dissent from the majority opinion and would overrule Smith's first, second, and third assignments of error as they pertain to his convictions in Cuyahoga C.P. No. 651674.

{¶ 145} In Cuyahoga C.P. No. 651674, Smith was convicted of felony domestic violence. The trial court admitted the victim's statements made on March 21, 2020, to the responding police officer, her statements made to emergency

medical technicians as recorded on the police body camera, the victim's medical records, and evidence of Smith's prior conviction for domestic violence.

{¶ 146} The majority opinion found that all the victim's statements made to police while she was in the ambulance were testimonial and thus inadmissible. Majority Opinion, ¶ 93. I disagree and would not find the victim's answers to the initial questioning by police to be testimonial under the primary purpose test announced by the United States Supreme Court in *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Police responded to an emergency call, the victim was being treated by emergency medical technicians, and the initial questions asked of the victim and her responses where for the police to assess the nature and circumstances of the call. *Id.* at 822 (Statements are not testimonial "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency."). I would further find that as the police learned the details as to what occurred, where it occurred, what occurred, and who was involved, the purpose of the questioning changed. The police sought to ascertain information as to specific details of the assault and information to later locate both the victim and Smith. Such questioning marked a change to the purpose of the interview because those questions were in made "to establish or prove past events potentially relevant to later criminal prosecution." *Id.*

{¶ 147} Having found the entirety of the victim's statements made to the police to be testimonial, the majority finds that the admission of those statements

was prejudicial and such error was not harmless. Majority Opinion, ¶ 105. I disagree. The trial court had admissible evidence in the form of the victim's initial statements to police, visual evidence of the injuries sustained, details of the assault in the victim's statements to the emergency medical technicians, and the victim's statements contained within her medical records. As such, I would find that the admission of the victim's statements once the purpose of the police questioning changed to be duplicative of, or cumulative to, the admissible evidence before the trial court and that the errant admission of the victim's statements constituted harmless error.