[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Smith*, Slip Opinion No. 2024-Ohio-5745.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-5745

THE STATE OF OHIO, APPELLANT, *v.* SMITH, APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Smith*, Slip Opinion No. 2024-Ohio-5745.]

*Criminal law—Confrontation Clause of the Sixth Amendment to the United States Constitution—Absent witness's statements to police officer captured on officer's body-camera video were testimonial because officer was not responding to an ongoing emergency when those statements were made, and admission of those statements at trial violated defendant's right to confrontation—Absent witness's statements to EMTs captured on the same body-camera video were nontestimonial because those statements were made for the purpose of receiving medical care, and admission of those statements at trial did not violate the Confrontation Clause—Court of appeals' judgment reversed and cause remanded.*

(No. 2023-1289—Submitted July 24, 2024—Decided December 10, 2024.)

APPEAL from the Court of Appeals for Cuyahoga County,

No. 111274, 2023-Ohio-603.

———————

FISCHER, J., authored the opinion of the court, which DONNELLY, STEWART, and BRUNNER, JJ., joined. DETERS, J., concurred in part and dissented in part, with an opinion joined by KENNEDY, C.J., and DEWINE, J.

**FISCHER, J.**

{¶ 1} We examine in this case whether the admission at trial of statements made by a domestic-violence victim, B.B., that were captured by a law-enforcement officer's body camera violated appellee Garry Smith's right to confrontation. As explained below, we conclude that B.B.'s statements made to EMTs that were captured on the body-camera video were nontestimonial; however, we conclude that all B.B.'s statements made to Police Officer Brian Soucek were testimonial because those statements were not given to assist the officer in responding to an ongoing emergency situation but rather, to further the officer's investigation of a crime that had already occurred. We therefore reverse the judgment of the Eighth District Court of Appeals as it pertains to Smith's convictions for the March 21, 2020 incident, and we remand the case to the Eighth District to determine whether any of the statements B.B. made in response to the EMTs' questions (i.e., the nontestimonial statements) were inadmissible hearsay, to conduct a harmless-error analysis, and to address Smith's third, fourth, and fifth assignments of error relating to the March 21, 2020 incident, as necessary.

## I. BACKGROUND

### A. Pre-Trial

{¶ 2} In November 2020, Smith was indicted on two counts of domestic violence in violation of R.C. 2919.25(A), a fourth-degree felony, with one pregnant-victim specification under R.C. 2941.1423, for an incident that occurred on March 21, 2020, in which Smith allegedly assaulted his pregnant fiancé, B.B.

*See State v. Smith*, Cuyahoga C.P. No. CR-20-651674-A. Smith pleaded not guilty to the charges.

{¶ 3} Smith filed a motion in limine seeking to preclude the State from introducing B.B.'s statements that were recorded by police officers' body cameras without having B.B. testify at his criminal trial. Smith argued that such evidence would constitute hearsay and prevent him from being able to cross-examine B.B., thus violating his right to confrontation. The State informed the trial court that it had subpoenaed B.B. and intended to call her as a witness. The State acknowledged that if B.B. failed to appear at trial, then there could be hearsay and confrontation issues concerning B.B.'s statements that were recorded by the officers' body cameras, but the State argued that B.B.'s statements would fall under various hearsay exceptions. The trial court initially denied Smith's motion in limine but reserved its final ruling until the evidence was introduced at trial.

**B. Trial**

{¶ 4} Smith waived his right to a jury trial and the matter proceeded to a bench trial.[1] B.B. failed to appear, and the State tried its case without her.

*1. The State's Case-in-Chief*

{¶ 5} The State called two witnesses to testify about the March 21, 2020 incident: Detective William Cunningham and Officer Soucek, both of the Cleveland Division of Police. Detective Cunningham investigated the incident. He tried numerous times to speak with B.B. about the incident but was unable to get in touch with her. Detective Cunningham identified B.B.'s medical records and photos of

---

1. In January 2021, Smith was indicted on two counts of felonious assault, in violation of R.C. 2903.11(A)(2), and one count of domestic violence, in violation of R.C. 2919.25(A), with at least one accompanying firearm specification for each count, for assaulting B.B. on December 26, 2020. *See State v. Smith*, Cuyahoga C.P. No. CR-20-655568-A. On the State's motion, the trial court consolidated Cuyahoga C.P. No. CR-20-655568-A and Cuyahoga C.P. No. CR-20-651674-A, and the cases were tried together. Smith was convicted of all counts in Cuyahoga C.P. No. CR-20-655568-A. However, because Smith's convictions in Cuyahoga C.P. No. CR-20-655568-A are not at issue here, we do not discuss the facts relevant to that case.

B.B.'s injuries that were taken while she was being treated at the hospital as the ones he had obtained using a search warrant.

{¶ 6} Officer Soucek was the responding officer to the call for an assaulted female, and his body camera captured B.B.'s statements and demeanor on the night of the incident. Before Officer Soucek testified, Smith challenged the admission of the officer's body-camera video into evidence on confrontation grounds. The trial court acknowledged the objection but did not rule on it at that time.

{¶ 7} The State proceeded to examine Officer Soucek, who at the time of trial had been a patrol officer for 11 years. He testified that on the evening of March 21, 2020, he and his partner received a dispatch call to a home "for a female assaulted." He activated his body camera and arrived at the scene within a few minutes of the dispatch.

{¶ 8} The State then played Officer Soucek's body-camera video, starting it at the 12-second mark, which showed Officer Soucek arriving on the scene. Smith renewed his objection to the State's use of the body-camera video, on the ground that it violated his right to confrontation. The trial court again noted the objection but did not rule on it.

{¶ 9} The State skipped to the 1:02 mark of the body-camera video, which showed Officer Soucek entering an ambulance. The footage between the 12-second mark and the 1:02 mark captured a relatively calm scene. As Officer Soucek arrived, two EMTs walked with a woman from the front porch of a house to an ambulance. And as Office Soucek approached the ambulance, a witness spoke to Officer Soucek's partner outside the ambulance; the witness was explaining that she had "called EMS because [B.B.] came on [her] doorstep."

{¶ 10} Officer Soucek entered the ambulance and saw a woman, whom he identified as the victim, B.B., being treated by two EMTs. Officer Soucek asked B.B., "So what happened?" Over Smith's objection, Officer Soucek testified about B.B.'s statement, relaying that B.B. told him that her fiancé had beaten her up

because she had had an argument with his niece and that her fiancé had ripped out her hair.

{¶ 11} The State asked Officer Soucek, "Specifically, what else?" But then the State immediately said, "That's all right, I'll just hit play."

{¶ 12} On the body-camera video, Officer Soucek next asked B.B., "Do you live with him?" B.B. replied, "We do live together." One of the EMTs then asked B.B., "Is this your niece here? She said you're five months pregnant? Does that sound about right? Did you take any kicks or punches or anything to the stomach?" B.B. answered, "To my knee, to my chest, to my stomach. I no longer feel my baby moving."

{¶ 13} While an EMT was asking B.B. questions concerning her physical condition, Officer Soucek had a conversation with his partner, who was standing to his left, outside the ambulance and off camera. Officer Soucek asked his partner, "Did it happen here?" His partner responded, "The niece said that [B.B.] wouldn't tell her anything, she just showed up at her house and knocked on her door and that [B.B.] lives in East Cleveland and that [the niece] doesn't know him at all." Upon receiving this information, Officer Soucek initiated the following exchange:

> Officer: Where did this happen at?
> B.B.: Outside.
> Officer: Outside where?
> EMT: In front of this house here?
> B.B.: It happened there down the street.
> Officer: On the street?
> B.B.: Yeah.
> Officer: Do you live over here?
> B.B.: No. We were on our way to her house, but it didn't happen in her house.

Officer: But it happened down the street here?

B.B.: We had an argument and, you know, we were all, we were drinking. I'm not even supposed to be drinking.

Officer: So, it happened in the car?

B.B.: Outside the car.

Officer: So, is he still in the area, or did he drive away?

B.B.: No. He drove way. He left.

Following that exchange, Officer Soucek asked B.B. for her Social Security number, her name, and her date of birth.

{¶ 14} The State paused the video at the 3:04 mark, and Officer Soucek testified about B.B.'s injuries, noting her swollen face and eye and "little spots of blood and glue" where her hair had been ripped out. He described B.B.'s clothing as disheveled, ripped, and dirty and stated that it appeared to him "that she [had been] in a fight."

{¶ 15} The State continued to play the body-camera video. On the video, Officer Soucek asked B.B. for her fiancé's name. B.B. answered, "Garry Smith . . . two r's." During this exchange, the EMTs told B.B. that she could keep talking but that they needed her to lie down on the gurney. While the EMTs moved B.B. from her seated position in the ambulance to lie down on the gurney, Officer Soucek continued questioning B.B., and she provided him with Smith's date of birth and the address where she lived with Smith. Officer Soucek told his partner to "call the boss for photos."

{¶ 16} Meanwhile, the EMTs continued to provide care to B.B. One EMT asked B.B. whether Smith had ripped out her hair, and B.B. confirmed that he had. The other EMT told B.B. that he was going to put her on a heart-rate monitor because her heart was beating so fast.

{¶ 17} After B.B. answered an EMT's question concerning her health insurance, Officer Soucek asked B.B. how far along she was in her pregnancy. B.B. responded that she was five months pregnant and that Smith was the father. One EMT followed up Officer Soucek's question by asking B.B. the due date of her baby. She told him that her baby was due in July. Officer Soucek then asked B.B. whether she and Smith had other children together. B.B. responded that they did not.

{¶ 18} After a discussion between the officers and the EMTs concerning where B.B. would be transported to receive further medical care, one EMT tried to confirm with B.B. that she had said she had been smoking and drinking; as the EMT proceeded to ask B.B. a follow-up question about her reported substance use, she shushed him. The EMT who asked B.B. those questions looked at Officer Soucek and B.B. shushed him again. The EMT then asked B.B. whether she had taken any drugs. B.B., in a hushed tone, replied, "I snorted cocaine. . . . When he beat me up, I. . . I snorted a couple lines of cocaine." The EMT explained that the question was asked to better understand why her heart rate was so high.

{¶ 19} While one EMT prepared the equipment to monitor B.B.'s heart rate, the other EMT asked B.B. how many times she had been pregnant, and B.B. responded to his questions. Officer Soucek then inquired more about the incident:

Officer: Can you tell me exactly what he did at the car?

B.B.: He punched me in my face and other people were trying to break it up and he pushed everybody away. He threatened to shoot me and said he would kill me. He was also intoxicated. Very intoxicated.

Officer: And he ripped out your hair?

B.B.: He ripped out my hair. This is what he did to me. He kneed me to the face, the chest, stomach.

The EMT who had prepared the heart-rate-monitoring equipment interrupted B.B. to connect the equipment to her, but he informed B.B. that she could keep talking to Officer Soucek. The officer then continued questioning B.B.:

> Officer: He kneed you in the stomach?
>
> B.B.: Yes.
>
> EMT: You're feeling no movement from the baby, right?
>
> B.B.: No movement. And it was moving until this incident happened.

{¶ 20} The State played the body-camera video until the end of this exchange, stopping it at the 6:42 mark. The State did not play the remainder of the video for "judicial economy" reasons. The remainder of the video shows the EMTs continuing to provide B.B. with medical care and Officer Soucek asking B.B. for a phone number where he could reach her. Officer Soucek left the ambulance to speak with B.B.'s family member who had called 9-1-1, telling her that B.B.'s assailant had "beat her up pretty good." As the ambulance drove away, Officer Soucek's partner informed him that their boss was coming to the scene to take photographs but that since the ambulance had left, they would all meet at the hospital. At trial, Officer Soucek confirmed that his body-camera video was a fair and accurate depiction of what he saw that night.

{¶ 21} Officer Soucek testified that he and his supervisor met B.B. at the hospital to take photographs for "the domestic violence part of the report." Over Smith's objection, the State asked Officer Soucek whether B.B. had "indicated on the body cam footage that [Smith had] threatened to kill her, threatened to shoot her," to which Officer Soucek replied, "Yes." Officer Soucek further testified,

again over Smith's objection, that B.B. had told him that Smith possessed a weapon and that Smith had assaulted her previously.

{¶ 22} At the close of the evidence, Smith's counsel again objected to admission of the body-camera video into evidence, on the ground it violated Smith's right to confrontation. The trial court overruled the objection, explaining that B.B.'s statements on the video were nontestimonial and were being "admitted under an excited utterance hearsay exception."

*2. The Defense*

{¶ 23} Smith testified in his own defense at trial. Regarding the March 21, 2020 incident, he denied hitting B.B. He maintained that when he left home that night, B.B. was "fine." And he suggested that B.B. had accused him of attacking her as a means of getting back at him because she thought he had cheated on her.

{¶ 24} During cross-examination, Smith acknowledged that he and B.B. had children together. Smith testified, "We say we married because we been together so long. We been together since 2002."

{¶ 25} At the trial's conclusion, the court found Smith guilty as charged and sentenced him accordingly.

**C. Appeal to the Eighth District Court of Appeals**

{¶ 26} Smith appealed his convictions to the Eighth District. 2023-Ohio-603, ¶ 71 (8th Dist.). He argued that the admission of Officer Soucek's body-camera video into evidence violated his right to confront witnesses against him and that the statements made in the video were inadmissible hearsay. Smith also challenged the manifest weight of the evidence of his conviction.

{¶ 27} The State argued that B.B.'s statements captured on Officer Soucek's body-camera video should be considered nontestimonial and admissible hearsay because they were made during a police interrogation under circumstances that indicated that the primary purpose of the interrogation was to respond to an ongoing

emergency. The State argued that the statements captured on the body-camera video were admissible as present-sense impressions or as excited utterances.

**{¶ 28}** The appellate court concluded that the totality of the circumstances surrounding Officer Soucek's interrogation of B.B. demonstrated that the primary purpose of B.B.'s statements to the police—statements in which B.B. identified Smith as her assailant and described what he had done to her—was to provide an account of the assault that had allegedly occurred (i.e., to document past events for purposes of a later criminal investigation or prosecution) and that the statements were therefore testimonial. *Id.* at ¶ 93. The appellate court thus concluded that the admission of all B.B.'s statements that were captured on the body-camera video violated Smith's confrontation rights. *Id*. at ¶ 101.

**{¶ 29}** Because its decision regarding Smith's confrontation-rights challenge was dispositive, the court of appeals did not consider Smith's challenge to the trial court's admission of B.B.'s statements on hearsay grounds or his challenge regarding the weight of the evidence for the March 2020 offenses.[2] 2020-Ohio-603 at ¶ 112 (8th Dist.). The court of appeals reversed the trial court's judgment as to the March 2020 incident, vacated Smith's convictions related to that incident, and remanded the case to the trial court for a new trial on the charges in Cuyahoga C.P. No. CR-20-651674-A. 2020-Ohio-603 at ¶ 143 (8th Dist.).

**{¶ 30}** The State moved for reconsideration and en banc consideration. The Eighth District denied the State's motions.

---

2. The Eighth District's approach to analyzing Smith's challenge to the admission of Officer Soucek's body-camera video as a violation of the Confrontation Clause of the Sixth Amendment to the United States Constitution before addressing whether the video was admissible under the Ohio Rules of Evidence was reasonable. Such an analysis is consistent with our approach to these types of challenges: "Because certain testimonial statements are barred by the Confrontation Clause of the Sixth Amendment to the United States Constitution irrespective of their admissibility under the Rules of Evidence, we undertake the constitutional inquiry first." *State v. Jones*, 2012-Ohio-5677, ¶ 136; *see State v. Wilcox*, 2024-Ohio-5719, ¶ 17, fn. 1 (lead opinion). We have applied this same analytical approach to combined evidentiary and Confrontation Clause arguments in other cases. *See, e.g.*, *State v. Ford*, 2019-Ohio-4539, ¶ 212-215; *State v. Hood*, 2012-Ohio-6208, ¶ 31-39.

**D. The State's Appeal to this Court**

{¶ 31} The State appealed to this court. We accepted jurisdiction over the State's sole proposition of law:

> The primary purpose of the statements from a domestic violence victim were not intended as substitutes for trial testimony but rather to meet an ongoing emergency. The arrival of the police and the fact that the suspect was not on scene did not render the victim's statements testimonial.

*See* 2024-Ohio-163.

**II. LAW**

{¶ 32} We consider whether the admission at Smith's criminal trial of B.B.'s statements made to the EMTs and to Officer Soucek as captured on Officer Soucek's body-camera video violated Smith's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. We review this issue of law de novo. *See State v. McKelton*, 2016-Ohio-5735, ¶ 172.

{¶ 33} The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court explained that the key question for determining whether a Confrontation Clause violation has occurred is whether an out-of-court statement is "testimonial." *Id.* at 59, 68. If a statement is testimonial, its admission into evidence will violate the defendant's right to confrontation if the defendant does not have an opportunity to cross-examine the declarant. *Id*. at 53-56.

{¶ 34} To determine whether a statement is testimonial, courts must look to post-*Crawford* decisions to ascertain whether the statement bears indicia of certain factors that would make it testimonial. "Statements are nontestimonial when made

in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822 (2006). Statements are "testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id*. For example, the primary purpose of a testimonial statement is to create an out-of-court substitute for trial testimony. *Ohio v. Clark*, 576 U.S. 237, 245 (2015). That primary purpose must be measured objectively by the trial court, accounting for the perspectives of the interrogator and the declarant. *Michigan v. Bryant*, 562 U.S. 344, 367-368 (2011).

{¶ 35} The most important factor in informing the primary purpose of an interrogation in a domestic-violence case is whether the statement was made during an ongoing emergency, i.e., whether there was a continuing threat to the victim. *See id.* at 363. This is because domestic-violence cases "often have a narrower zone of potential victims than cases involving threats to public safety." *Id*. A conversation that begins as an interrogation to determine the need for emergency services may evolve into a testimonial statement once the purpose of rendering emergency assistance has been achieved. *Davis* at 828.

{¶ 36} Examining two domestic-violence cases in *Davis*, the United States Supreme Court held that the statements the victim in *Davis* made to police during a 9-1-1 call were nontestimonial on several grounds, including that the victim "was 'speaking about events *as they were actually happening*, rather than "describ[ing] past events,"' that there was an ongoing emergency, that the 'elicited statements were necessary to be able to *resolve* the present emergency,' and that the statements were not formal." (Emphasis and brackets added in *Davis*.) *Bryant* at 356-357, quoting *Davis* at 827, quoting *Lilly v. Virginia*, 527 U.S. 116, 137 (1999) (plurality opinion). And in *Indiana v. Hammon*, the second domestic-violence case resolved

in *Davis*, the Supreme Court held that statements the victim made to police from inside her home while her abuser was still present but was relegated to another room were "'part of an investigation into possibly criminal past conduct.'" *Bryant* at 357, quoting *Davis* at 829. The Supreme Court found that there was "'no emergency in progress,'" because the officer questioning the victim "'was not seeking to determine . . . "what is happening," but rather "what happened."'" *Id.*, quoting *Davis* at 830. Because the victim's statements "'were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation,'" the Supreme Court held that those statements were testimonial. *Id.*, quoting *Davis* at 832.

{¶ 37} And in examining a case concerning a mortally wounded victim in *Bryant,* the United States Supreme Court reiterated the importance of ascertaining whether the statements were made during an ongoing emergency: "The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than 'prov[ing] past events potentially relevant to later criminal prosecution'" (brackets added in *Bryant*), *id.*, 562 U.S. at 361, quoting *Davis*, 547 U.S. at 822. The Court emphasized that the existence of an ongoing emergency must be "objectively assessed from the perspectives of the parties to the interrogation at the time" and "not with the benefit of hindsight." *Id.* at 361, fn. 8.

{¶ 38} Another factor that should be considered is the degree of formality of the interrogation. *Id.* at 366. The Supreme Court noted that the questioning in *Bryant* occurred in a public area before emergency services arrived, as opposed to at police headquarters. *Id.* "The informality suggests that the interrogators' primary purpose was simply to address what they perceived to be an ongoing emergency, and the circumstances lacked any formality that would have alerted [the witness] to or focused him on the possible future prosecutorial use of his statements." *Id.* at 377.

{¶ 39} Additionally, courts should consider the "statements and actions of both the declarant and interrogators." *Id*. at 367. The interaction between the interrogators and the witness provides insight into how the witness believes his or her statements will be used. *See id*. at 368-378; *see also id.* at 378-379 (Thomas, J., concurring in the judgment); *id*. at 379-395 (Scalia, J., dissenting); *id*. at 395-396 (Ginsburg, J., dissenting).

{¶ 40} Thus, "when a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the 'primary purpose of the interrogation' by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs." *Bryant*, 562 U.S. at 370.

### III. ANALYSIS

#### A. B.B.'s Statements to Officer Soucek Were Testimonial

{¶ 41} To properly analyze the Confrontation Clause issue presented here, we must look at the situation from both Officer Soucek's and B.B.'s perspectives to determine whether the primary purpose of the officer's interrogation of the victim was to enable police to respond to an ongoing emergency. *See Bryant* at 361, fn. 8 ("The existence of an ongoing emergency must be objectively assessed from the perspective of the parties to the interrogation at the time, not with the benefit of hindsight.") Reviewing the facts of this case from Officer Soucek's perspective, we find no evidence of an ongoing emergency when B.B. was responding to Officer Soucek's questions.

{¶ 42} Officer Soucek testified at trial that he had received a dispatch call to respond to a female who had been assaulted and that "as [he] arrived on the scene, the female was already being escorted into the EMS wagon." Additionally, Officer Soucek's body camera captured a witness explaining to Officer Soucek's partner that she had "called EMS because [B.B.] came on [her] doorstep." The body-camera video captured a relatively calm scene with one witness speaking to

Officer Soucek's partner outside the ambulance and two EMTs walking with a woman to an ambulance; there was no shouting, arguing, or overall commotion. *See Davis*, 547 U.S. at 830. So before his interrogation of B.B. began, Officer Soucek (1) knew from his dispatcher that a female had been assaulted, (2) heard from a witness that the victim had arrived at the 9-1-1 caller's home already battered, and (3) observed the victim walk with EMTs to the ambulance where she began receiving medical care. An objective assessment of this information demonstrates that Officer Soucek knew that any active threat against the victim, B.B., had been eliminated and that he was investigating a situation in which a female *had been assaulted*.

{¶ 43} It is true that "[a]n assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue," *Bryant*, 562 U.S. at 363. And generally, such an assessment could not have occurred until Officer Soucek ascertained what had happened to B.B. However, Officer Soucek's approach to interrogating B.B. confirms that he did not believe that he was responding to an ongoing emergency.

{¶ 44} At trial, Officer Soucek testified that he "began to interview [B.B.] about the incident," and he did so by asking, "So what happened?" After B.B. confirmed that she had been assaulted by her fiancé, whom she later identified as Smith, Officer Soucek did not follow up with questions that would allow him to further assess the situation or determine whether Smith presented any possible threat to his own safety or the safety of others, such as by asking B.B. questions about Smith, where the incident occurred, or whether Smith had a weapon. Instead, Officer Soucek asked B.B., "Do you live with him?"

{¶ 45} This follow-up question did nothing to establish whether Smith presented a danger to others. And Officer Soucek did not need to eliminate Smith as an ongoing threat to B.B., because she was safe with Officer Soucek and the

EMTs in the ambulance. This question is relevant only when an officer is considering whether to pursue an arrest warrant or seek prosecution against a person, *see* R.C. 2935.09, since a person can be charged with domestic violence only if the victim is a family or household member, *see* R.C. 2919.25. This question had no bearing, at least in this case, on whether there was an ongoing emergency.

{¶ 46} And while Officer Soucek eventually questioned B.B. about Smith and the location of the attack, he did so only after he received information from his partner that the assault had not occurred inside the home from which B.B. had just exited. There is no evidence in the record that Officer Soucek or his partner sought more information about Smith to ensure that he was not a threat to others. Indeed, there is no evidence that Officer Soucek or his partner called for backup or ordered a search for Smith while B.B. was receiving medical care in the ambulance. As demonstrated in the body-camera video, no other officers arrived on the scene, and Officer Soucek told his partner to call their supervisor only to photograph B.B.'s injuries.

{¶ 47} The facts of this case demonstrate that Officer Soucek had information that he was responding to a female who had been assaulted and was being treated by EMTs prior to his arrival at the scene, and his actions demonstrate that he did not treat the assault on B.B. as an ongoing emergency but rather, as an investigation into past criminal conduct of B.B.'s assailant. As the United States Supreme Court has stated, "the emergency is relevant to the 'primary purpose of the interrogation' because of the effect it has on the parties' purpose, not because of its actual existence," *Bryant*, 562 U.S. at 361, fn. 8.

{¶ 48} And B.B. did not treat the situation as an ongoing emergency, as demonstrated by her own statements and actions. B.B. knew she was pregnant at the time of the incident. She knew that Smith had hit her, ripped out her hair, then drove away, leaving her near a family member's home. And after the fight, B.B. snorted "a couple lines of cocaine" before her family member called 9-1-1.

16

{¶ 49} The body-camera video demonstrates that B.B. sought assistance from her family member and medical attention from the EMTs before the police interrogation began inside the ambulance. At no time does the body-camera video show B.B. actively calling for help or providing police with information that would indicate that Smith was a continued threat to her or others. *See Davis*, 547 U.S. at 828-832. And while B.B. had not informed Officer Soucek of the full extent of the situation prior to the interrogation, it is apparent that she or her family member had already discussed the situation with the EMTs, given the extent of their questions during the first few minutes of the body-camera video.

{¶ 50} B.B. knew that Smith was not a threat to her at the time of the police interrogation. The body-camera video shows that B.B. spoke to Officer Soucek about the incident without reservation and that she was much more hesitant to answer questions when it came to her own criminal activity: B.B. shushed an EMT when he asked her about the extent of her drug use. B.B.'s selective disclosure of information and hesitancy to admit her own criminal activity in front of a police officer demonstrates that she had testimonial intent when she made statements to the officer concerning the assault. *See Davis* at 830 ("statements [made during] an official interrogation are an obvious substitute for live testimony because they do precisely *what a witness does* on direct examination" [emphasis in original]). These facts demonstrate that B.B.'s purpose in answering Officer Soucek's questions was not to aid in the officer's response to an ongoing emergency but rather, to tell her account of the incident.

{¶ 51} Additionally, the formality of the encounter between Officer Soucek and B.B. is far from the harried 9-1-1 call that was at issue in *Davis*. The interaction between Officer Soucek and B.B. in this case more closely resembles the interrogation in *Hammon*, in which the officer interviewed the victim inside her home while she was separated from her husband, questioned her about what had happened, and had her sign a battery affidavit. *See Davis* at 819-820, 830.

{¶ 52} Officer Soucek's interrogation of B.B. was not conducted at the police station; B.B. spoke to Officer Soucek in the back of an ambulance where she was being attended by EMTs—away from any witnesses to the assault and safely away from her attacker. And while Officer Soucek did not ask B.B. for a signed affidavit, his body camera recorded the entire exchange. Officer Soucek's body camera recorded him actively taking handwritten notes of B.B.'s answers. And as discussed above, B.B. freely spoke with Officer Soucek about the incident but was hesitant to answer questions when it came to her own criminal activity.

{¶ 53} Reviewing these facts objectively from both Officer Soucek's and B.B.'s perspectives, and considering the formality of the interrogation, we do not find that the primary purpose of Officer Soucek's interrogation of B.B. in the ambulance was to respond to an ongoing emergency. Rather, the primary purpose of the interrogation was to establish or prove past events potentially relevant to later criminal prosecution of B.B.'s assailant. We therefore conclude that B.B.'s statements to Officer Soucek captured by the officer's body camera were testimonial in nature and that their admission into evidence at Smith's criminal trial violated Smith's right to confrontation.

## B. B.B.'s Statements to the EMTs Were Nontestimonial

{¶ 54} Officer Soucek's body camera recorded not only B.B.'s responses to his questions but also B.B.'s responses to the EMTs' questions concerning her medical history. We have held that statements made for purposes of medical diagnosis and treatment are nontestimonial and that their admission into evidence at trial does not violate the Confrontation Clause. *State v. Arnold*, 2010-Ohio-2742, ¶ 41.

{¶ 55} B.B. was actively receiving medical care when her statements were captured by Officer Soucek's body camera. Every statement B.B. made in response to the EMTs' questions was for the primary purpose of receiving medical care, not creating a record for use at trial. So those statements were nontestimonial and the

admission of those statements at Smith's trial did not violate Smith's right to confrontation.

## IV. REVERSE AND REMAND TO THE EIGHTH DISTRICT

{¶ 56} We conclude that the Eighth District Court of Appeals erred in its determination that all statements made by B.B. that were captured by Officer Soucek's body camera while B.B. was in the ambulance must be excluded on constitutional grounds. Only those statements that B.B. made in response to Officer Soucek's questions should have been excluded on that basis. We therefore reverse the judgment of the court of appeals as it pertains to Smith's convictions for the March 21, 2020 incident.

{¶ 57} Because this appeal is limited solely to the Confrontation Clause issue, we decline to address admissibility issues pertaining to B.B.'s statements under the Ohio Rules of Evidence. Instead, we remand the case to the Eighth District. On remand, the court of appeals must determine whether any of the statements B.B. made in response to the EMTs' questions (i.e., the nontestimonial statements) were inadmissible hearsay, thereby addressing Smith's second assignment of error. After making that determination, the Eighth District must revisit its harmless-error determination and address Smith's third, fourth, and fifth assignments of error relating to the March 21, 2020 incident, as necessary.

Judgment reversed
and cause remanded.

_____

**DETERS, J., joined by KENNEDY, C.J., and DEWINE, J., concurring in part and dissenting in part.**

{¶ 58} The majority correctly concludes that B.B.'s statements to the EMTs that were captured by a police officer's body camera were nontestimonial and that the Eighth District Court of Appeals erred when it held that those statements should have been excluded from evidence in appellee Garry Smith's criminal trial. And

the majority is correct that the case needs to be remanded to the court of appeals for a determination whether B.B.'s nontestimonial statements were inadmissible hearsay. Where the majority goes astray is in its conclusion that all B.B.'s statements to Police Officer Brian Soucek should have been excluded from evidence because they were testimonial. I therefore respectfully concur in part and dissent in part.

**The Confrontation Clause and statements made by unavailable witnesses**

{¶ 59} The Sixth Amendment to the United States Constitution guarantees an accused the right "to be confronted with the witnesses against him." "The 'primary object' of this provision is to prevent unchallenged testimony from being used to convict an accused . . . ." *State v. Carter*, 2024-Ohio-1247, ¶ 27, citing *Mattox v. United States*, 156 U.S. 237, 242 (1895), and *Crawford v. Washington*, 541 U.S. 36, 53 (2004). In *Crawford*, the United States Supreme Court reviewed the history of the Confrontation Clause with respect to unavailable witnesses. The guiding principle gleaned from that history is this: "Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine," *Crawford* at 59. The Court "[left] for another day any effort to spell out a comprehensive definition of 'testimonial.' " *Id.* at 68. But the Court did instruct that "[w]hatever the term ['testimonial'] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.*

{¶ 60} In later cases, the Court described more fully the contours of the term. In *Davis v. Washington*, 547 U.S. 813 (2006), the Court considered two cases that had been consolidated for decision involving the admission of out-of-court statements made by witnesses who did not appear at trial. In the first case, *Davis v. Washington*, the recording of a 9-1-1 call was admitted at trial. On the recording, the victim told the operator that her boyfriend was assaulting her. In response to

questions from the operator, the victim identified her attacker as Adrian Davis. When the victim told the operator that her boyfriend had left the residence, the operator continued to question the victim, obtaining more information about Davis and a description of the events leading up to the attack. The trial court admitted the recording over Davis's objection that doing so violated his confrontation rights. The Washington Court of Appeals and the Washington Supreme Court affirmed the trial court's judgment. *Id.* at 819.

{¶ 61} In the second case, *Hammon v. Indiana*, police responded to a domestic disturbance and found the victim alone on the porch appearing somewhat frightened. The victim told police that nothing was wrong, but after being questioned by officers, she described to them what had happened and attested in an affidavit that her husband had shoved her to the floor, hit her in the chest, and attacked her daughter. The trial court admitted the victim's statements as testified to by the officer as an excited utterance and admitted the statements contained in the affidavit as a present-sense impression. The Indiana Supreme Court concluded that the victim's verbal statements were nontestimonial and admissible as an excited utterance. *Davis* at ¶ 821. However, the Indiana Supreme Court concluded that the statements in the affidavit signed by the victim were testimonial and had been wrongly admitted into evidence but that the affidavit's admission was harmless beyond a reasonable doubt. *Id.*

{¶ 62} The United States Supreme Court set forth what would become known as the "primary purpose test":

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such

ongoing emergency, and that the primary purpose of the
interrogation is to establish or prove past events potentially relevant
to later criminal prosecution.

*Davis* at 822. The Court reserved for another day the question "whether and when
statements made to someone other than law enforcement personnel are
'testimonial.'" *Id.* at 823, fn. 2.

{¶ 63} The Court in *Davis* also recognized the fluidity of interrogations
involving ongoing emergencies: "This is not to say that conversation which begins
as an interrogation to determine the need for emergency assistance cannot . . .
'evolve into testimonial statements,' . . . once that purpose has been achieved." *Id.*,
547 U.S. at 828. The Court explained that it was for trial courts to determine
whether portions of statements are testimonial and to exclude those portions. *Id.*
Applying these principles, the Court affirmed the Washington Supreme Court's
judgment in *Davis v. Washington* and reversed the Indiana Supreme Court's
judgment in *Hammon v. Indiana*, remanding that matter for further proceedings.
*Davis* at 834.

{¶ 64} The United States Supreme Court refined its explanation of what
constitutes a testimonial statement in *Michigan v. Bryant*, 562 U.S. 344 (2011). In
that case, the Court considered statements made to police officers by a mortally
wounded victim. The officers found the victim at a gas station. When they asked
what had happened, the victim identified the person who had shot him, and he told
officers where the shooting had occurred. The victim died shortly after the police
found him. The Michigan Supreme Court held that admission of the victim's
statements into evidence violated the defendant's confrontation rights because there
was not an ongoing emergency at the gas station when he made the statements and
because the police officers' questions were directed at determining what had
already happened. *Id.* at 351.

{¶ 65} The United States Supreme Court vacated the Michigan court's judgment and remanded the case for further proceedings. *Id.* at 378. In doing so, the Court provided guidance on how courts should determine whether statements are testimonial.

{¶ 66} The Court reiterated the importance of ascertaining whether the statements were made during an ongoing emergency: "The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than 'prov[ing] past events potentially relevant to later criminal prosecution.'" (Brackets added in *Bryant*.) *Id.* at 361, quoting *Davis*, 547 U.S. at 822. Relevant to the case before us is the Court's note that

> [t]he existence of an ongoing emergency must be objectively assessed from the perspective of the parties to the interrogation at the time, not with the benefit of hindsight. If the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief was later proved incorrect, that is sufficient for purposes of the Confrontation Clause. The emergency is relevant to the "primary purpose of the interrogation" because of the effect it has on the parties' purpose, not because of its actual existence.

*Id.* at 361, fn. 8.

{¶ 67} Although the existence of an ongoing emergency is important to the inquiry whether a statement is testimonial, it is not the sole factor to be considered. "[W]hether an ongoing emergency exists is simply one factor—albeit an important factor—that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Bryant*, 562 U.S. at 366.

{¶ 68} Other factors that should be considered are the degree of formality of the interrogation, *id.*, and "statements and actions of both the declarant and interrogators," *id.* at 367. Regarding the former factor, the Court noted that the questioning in *Bryant* occurred in a public area before emergency services arrived, as opposed to at police headquarters. *Id.* at 366. "The informality suggests that the interrogators' primary purpose was simply to address what they perceived to be an ongoing emergency, and the circumstances lacked any formality that would have alerted [the witness] to or focused him on the possible future prosecutorial use of his statements." *Id.* at 377. As to the latter factor, the interaction between the interrogators and the witness also provides insight into how the witness believes his or her statements will be used. *See id.* at 368-378; *see also id.* at 378-379 (Thomas, J., concurring in the judgment); *id.* at 379-395 (Scalia, J., dissenting); *id.* at 395-396 (Ginsburg, J., dissenting).

{¶ 69} In short, "when a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the 'primary purpose of the interrogation' by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs." *Id.* at 370.

### Where the majority gets it wrong

{¶ 70} Keeping these principles in mind, I will explain where the majority goes wrong in its decision.

{¶ 71} First, the majority ignores the United States Supreme Court's directive in *Bryant* that whether an ongoing emergency existed at the time of police questioning is but one factor to be considered when determining whether a witness's statements are testimonial. *See Bryant*, 562 U.S. at 366. That "there was no shouting, arguing, or overall commotion" occurring while B.B. spoke with Officer Soucek, majority opinion, ¶ 42, is important, but it is not the only consideration in determining whether B.B.'s statements to the officer were

testimonial. Seemingly discounted by the majority is that Officer Soucek questioned B.B. in an ambulance while she was receiving medical care. Other than the fact that a police officer was asking the questions, the encounter had no trappings of a formal interrogation at police headquarters.

{¶ 72} More troublingly, the majority makes the same mistake as did the Eighth District by using hindsight to inform its determination whether B.B.'s statements to Officer Soucek were testimonial, rather than focusing on what the parties knew at the time of the questioning. The majority attaches great weight to Officer Soucek's testimony that he was responding to a call reporting "a female assaulted." The majority emphasizes that the report of the assault was made in the past tense, stressing that "a female *had been assaulted.*" (Emphasis in original.) *Id.* Presumably the argument propounded by the majority is that because the 9-1-1 caller did not report that a female was currently being assaulted, Officer Soucek knew there was no ongoing emergency when he began questioning B.B.

{¶ 73} While we know now, having the benefit of Officer Soucek's investigation, that there was no ongoing emergency while B.B. was being questioned in the ambulance, Officer Soucek could not have known that until he ascertained from B.B. that her assailant, whom she identified as Smith, had left the area. Had Smith remained in the area, Officer Soucek could reasonably have had concerns that Smith—who had allegedly just beaten a pregnant woman—posed a continuing threat not only to B.B. but also to Officer Soucek, people who lived at the home with Smith and B.B., and others in the area. And only after B.B. told Officer Soucek that Smith had left the area did the officer know there was no ongoing emergency. I would conclude that up to that point, B.B.'s statements captured by the officer's body camera were nontestimonial.

### Where the majority gets it right

{¶ 74} As discussed above, the United States Supreme Court has cautioned that interrogations can evolve as the need to respond to an ongoing emergency is

eliminated. Therefore, each statement in such situations must be considered separately to determine its purpose.

{¶ 75} After B.B. told Officer Soucek that her attacker had left the scene, the purpose of her statements evolved. There was no longer a question of a continuing threat to B.B.: she was in the ambulance, and Smith had left the scene. Moreover, because there was no indication that Smith was armed or that the incident went beyond a domestic-violence attack, Smith did not present a threat to the public. Officer Soucek's request for B.B.'s Social Security number marked the turning point when his questioning was directed toward creating a record for trial. He asked B.B. how many children she and Smith had together—a question relevant for a domestic-violence prosecution. And he asked what "exactly" occurred during the attack. That question and the response it elicited were not primarily for a nontestimonial purpose. I agree with the majority that B.B's statements after Officer Soucek asked for her Social Security number were testimonial and should have been excluded from evidence at Smith's trial.

{¶ 76} The majority gets it right on another point too. B.B.'s statements to the EMTs differ from those she made to Officer Soucek. B.B. was acting to receive medical care when her statements to the EMTs were captured by Officer Soucek's body camera. Thus, all the statements she made in response to the EMTs' questions were for the primary purpose of receiving medical care, not creating a record for use at trial. So those statements were nontestimonial. However, they are still subject to review for admissibility under the Ohio Rules of Evidence.

## Conclusion

{¶ 77} The majority's review of B.B.'s statements to Officer Soucek with a hindsight perspective is flawed. Considered "in light of the circumstances in which the interrogation occur[red]," *Bryant*, 562 U.S. at 370, some of the statements made by B.B. early in her encounter with Officer Soucek were not made with the primary

purpose of creating a record for trial and so were nontestimonial. I therefore respectfully concur in part and dissent in part.

————————————

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kristen Hatcher and Daniel T. Van, Assistant Prosecuting Attorneys, for appellant.

Cullen Sweeney, Cuyahoga County Public Defender, and Michael Wilhelm and John T. Martin, Assistant Public Defenders, for appellee.

Steven L. Taylor, urging reversal for amicus curiae Ohio Prosecuting Attorneys Association.

Alexandria M. Ruden and Tonya Whitsett, urging reversal for amici curiae Legal Aid Society of Cleveland, Alliance for HOPE International, and Ohio Domestic Violence Network.

Calfee, Halter & Griswold, L.L.P., Jason J. Blake, and Gretchen L. Whaling, urging reversal for amici curiae AEquitas and Joyful Heart Foundation.

————————————